Michael GRABOI and Nicole Graboi, Plaintiffs,

v.

Henry KIBEL and Anna Levinson, Defendants.

No. 75 Civ. 0298 (GLG).

United States District Court, S. D. New York.

May 26, 1977.

Bradley B. Davis, New York City, for plaintiffs.

Raymond J. MacDonnell, New York City, for defendant Levinson by Leo E. Bersen, White Plains, N. Y., of counsel.

## OPINION

GOETTEL, District Judge.

This diversity action arises from an alleged rape on April 11, 1969, of plaintiff, Nicole Graboi, by a doorman employed by defendants Kibel and Levinson.[1] At the time of the incident, plaintiff was visiting her father, also a named plaintiff,[2] who was a tenant in the defendants' building. The complaint states two causes of action: the first, asserting defendants' vicarious liability for their employee's intentional tort of assault and battery; and the second, claiming breach of the "covenant of quiet enjoyment and peaceful occupancy" contained in the lease.

---

1. While both defendants have, according to the docket sheet, been served, only Levinson has appeared. Plaintiff has not moved for a severance of the claim against Kibel or a default judgment.

2. References to "plaintiff" throughout this opinion will be limited to Nicole Graboi, although the opinion applies with equal force to her father's derivative claim for medical expenses and mental anguish.

Defendant Levinson has moved to dismiss the complaint on the ground that these causes of action are barred by the applicable statutes of limitations. Plaintiff responds that the limitations periods have been tolled due to plaintiff's insanity. In addition, she has cross moved under F.R. C.P. 15(a) to amend the complaint by adding a cause of action based on several theories of negligence, claiming that: (1) the terrace of the apartment was negligently constructed so as to facilitate easy access by an intruder; (2) the building had inadequate security; and (3) the defendants acted negligently in hiring the doorman since they knew or should have known of his propensity for violence.[3]

 Rule 15(a) requires that leave to amend be freely given "when justice so requires." Since the thrust of the federal rules is to promote decisions on the merits, courts will grant amendments, absent countervailing considerations such as prejudice to a party, undue delay of the trial, or the movant's bad faith. 3 *Moore's Federal Practice* ¶ 15.08[2] (1974). Although courts view favorably requests for amendments, the probability that the proposed cause of action is barred by the statute of limitations and does not relate back under F.R.C.P. 15(c) is a factor which militates against amendment. *Middle Atlantic Util. Co. v. S.M.W. Dev. Corp.*, 392 F.2d 380 (2d Cir. 1968); *Pasos v. Pan American Airways*, 17 F.R.Serv. 15a.34 (S.D.N.Y.1952).

 Rule 15(c) permits relation back of a claim asserted in an amended pleading if it "arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." In determining whether a claim should relate back, the inquiry should focus upon whether the statement of facts in the original pleading gave notice of the claim now sought to be added. *Rosenberg*

*v. Martin*, 478 F.2d 520 (2d Cir.), *cert. denied*, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973).

█ The original complaint premised defendants' liability upon two distinct theories: vicarious liability for the intentional torts of an employee and contractual responsibility flowing from an alleged breach of the lease. The cryptic factual allegations supporting these claims cannot be said to have apprised defendants that they should be prepared to respond to causes of action based upon negligent construction and maintenance or inadequate security.[4] Moreover, even if these claims could be regarded as relating back, other considerations weigh against permitting amendment. The first is the obvious prejudice to the defendant. The alleged rape which is the basis of the action occurred on April 11, 1969, and suit was not commenced until January, 1975. Even then, plaintiff delayed almost two years in seeking an amendment to add negligence claims. Defendant maintains that eight year old maintenance records and the original construction records are not available. While failing to indicate whether they existed on the date suit was brought, clearly plaintiff's two year delay in asserting new claims compound the potential difficulty at trial of proving the condition of the building and the security methods in use at the time of the incident. Moreover, plaintiff's delay calls into question her good faith. Defendant contends, without a contrary response, that Judge Lasker called plaintiff's attorney's attention to the absence of a negligence claim during a pre-trial conference held over a year ago. According to the defendant, plaintiff replied that amendment would be futile because he did not believe negligence claims could be sustained. Regardless of whether such an ex-

---

**3.** Plaintiff also asks permission to change references to plaintiff in the original complaint as a "guest" in her father's apartment, and to allege that she was a "resident." The evidence adduced (see *infra*) does not support the desired amendment.

**4.** It should be noted that the claim of inadequate security suffers from the additional defect that its merit is highly questionable. The doorman, the alleged rapist in this case, is the person who was presumably responsible for supplying the security. For this reason, the claim of inadequate security would appear to be duplicative of the claim for negligent hiring.

change occurred, the failure of the claim to relate back, coupled with plaintiff's delay in seeking an amendment, causes this Court, in its discretion, to deny amendment to include claims for negligent construction and maintenance and for inadequate security.

The third claim sought to be asserted—negligent hiring of the employee doorman—stands on a different footing. The facts underlying the original claim for assault give fair notice to the defendants of a claim that had the defendant used due care in hiring their employee, the assault would not have occurred. *Cf. Flaherty v. United Engineers & Constructors, Inc.*, 213 F.Supp. 835 (E.D.Pa.1961) (leave granted to add claim for assault to negligence claim even though original complaint was filed over two and a half years earlier). Therefore, finding that the nature of the claim for negligent hiring is such that it should relate back, the Court must next determine whether amendment nevertheless should be denied because the claim is barred by the applicable statute of limitations. *Middle Atlantic Utility Co. v. S.M.W. Dev. Corp., supra*. Crucial to this inquiry, of course, is the initial resolution of which statutes of limitations apply and whether they have been extended by a tolling period.

Determining the appropriate statute of limitations can sometimes be difficult. Taking the easier ones first, the assault claim is clearly governed by the one year limitations period provided by N.Y.C.P.L.R. § 215(3) (McKinney 1972). Similarly, the negligence claims sought to be asserted are subject to a three year period since they are actions "to recover damages for personal injury" under N.Y.C.P.L.R. § 214(5) (McKinney 1972). The claim for breach of an express covenant in the lease raises more troublesome issues.[5] At first glance, it would appear to be governed by the six year period of N.Y.C.P.L.R. § 213(2) (McKinney 1972) which controls actions "upon a contractual liability express or im-

plied." The defendant argues, however, that the essence of plaintiff's claim sounds in negligence and, therefore, the three year statute of limitations applies.

■ In applying a statute of limitations, New York courts have consistently held that "the reality, and the essence of the action and not its mere name" are controlling. *Brick v. Cohn-Hall-Marx Co.*, 276 N.Y. 259, 264, 11 N.E.2d 902, 904 (1937) (contract rather than fraud statute of limitations held applicable). For this reason, where the gravamen of the cause of action is to recover damages for personal injury, the negligence and not the contract period applies. *Hermes v. Westchester Racing Assoc.*, 213 App.Div. 147, 210 N.Y.S.2d 114 (1st Dep't 1925). In other words, where the duty to use due care stems from a contractual relationship, plaintiff may elect to proceed upon either a tort or contract theory in proving the case, but the negligence statute of limitations will control. *Atlas Assurance Co. v. Barry Tire & Serv. Co.*, 3 A.D.2d 787, 160 N.Y.S.2d 547 (3d Dep't 1957).

The New York courts have passed upon a situation closely analogous to that presented here. In *Alyssa Originals, Inc. v. Finkelstein*, 22 A.D.2d 701, 254 N.Y.S.2d 21 (2d Dep't 1964), *aff'd*, 24 N.Y.2d 976, 302 N.Y.S.2d 599, 250 N.E.2d 82 (1969), plaintiff sued his landlord for damages to his property alleging breach of an express covenant of quiet enjoyment incorporated ·in the lease. The court held that the action was barred by the three year negligence statute of limitations, saying:

"[Plaintiff's] position, however, is that the six-year Statute of Limitations . . relating to actions 'upon a contractual obligation or liability express or implied,' is applicable. With this contention we disagree. . . . Negligence of the landlord is the crux of the causes of action here; and, without proof of such negligence there can be no recovery, since without negligence in this case there is no independent breach of the provisions in the lease."

---

5. The breach of a lease provision would appear to create a contractual cause of action for the plaintiff only if she were a resident of the apartment or otherwise a third party beneficiary of the lease. See fn. 3 *supra* and discussion of facts *infra*.

*Id.* 22 A.D.2d at 701, 254 N.Y.S.2d at 23. The continuing viability of this case is implied by its citation in a recent decision of the Appellate Division, *Steiner v. Wenning*, 53 A.D.2d 437, 440, 386 N.Y.S.2d 429, 432 (2d Dep't 1976). The Court, following the same rationale used in *Alyssa Originals*, held that defective performance by architects in supervising the construction of a building was governed by the three year malpractice rather than the six year contract statute of limitations.

Plaintiff's attorney admits that these cases have an impact upon Nicole Graboi's claim since it clearly stems from her personal injuries suffered during the rape. Plaintiff contends, however, that they do not affect her father's claim for medical expenses and mental anguish. Plaintiff does not support, by reference to case law, this apparently novel theory that a claim deriving from another's personal injuries gets the benefit of a longer statute of limitations than the primary claim could achieve. Lacking such support, the Court will not deviate from the general rule that derivative claims are barred when the claim upon which they rest expire. Moreover, this rule cannot be circumvented by mislabelling as contractual a derivative claim based on another person's injuries. *Mamunes v. Williamsburgh General Hospital*, 28 A.D.2d 998, 283 N.Y.S.2d 457 (2d Dep't 1967), *aff'd*, 23 N.Y.2d 757, 296 N.Y.S.2d 954, 244 N.E.2d 468 (1968).

Because the essence of the cause of action stylized as "contractual" is clearly plaintiff's personal injuries, the three year statute of limitations applies to this cause of action as well as the negligence claims. For this reason, the presence of a toll becomes crucial, because without it, all the causes of action stated in the complaint or sought to be added through amendment are time barred. (This would include the two additional negligence theories rejected as not relating back to the original complaint.)

On February 3, 1977, the Court, sitting without a jury,[6] conducted an evidentiary hearing limited to the issue of whether or not plaintiff's insanity tolled the statutes of limitations. Plaintiff, Nicole Graboi, testified and called two additional witnesses: Dr. Herbert Rosenthal, a psychiatrist who first began treating plaintiff in 1976 and Rabbi Schlomo Carlebach, a friend and personal counselor of plaintiff during the period of purported incompetency. The defendants presented no witnesses.

In 1968, plaintiff was graduated, *cum laude*, from Brandeis. She had majored in psychology, a subject of some personal interest to her since she had had serious emotional problems in earlier years. In the early part of 1969, she drove from Chicago, where she had been living, to New York and was involved in a serious auto accident which demolished the car. Her father apparently suspected that this accident was an attempted suicide. Thereafter, she stayed at her father's New York apartment for a short time.

Plaintiff testified that on the evening of April 11, 1969, she was alone in her father's apartment when defendants' doorman entered from the adjoining terrace and threatened her with a knife. In trying to defend herself, plaintiff received a severe knife slash on her right hand. During the rape, plaintiff testified that, hoping to avoid further injury, she feigned orgasm and told her assailant that she had no protection against pregnancy, convincing him that he should avoid impregnating her. After he left, she called her father. He found her distraught and, assuming she had attempted suicide and not believing she had been raped, committed her to Gracie Square General Hospital for psychiatric observation. The examining physician accepted her version of the rape, finding that her distress was caused, in part, by her father's disbelief in her story. While diagnosing her condition as "schizophrenic reaction, acute undifferentiated type," the medical staff noted that neither psychotic material nor suicidal intent were elicited from the patient. Plaintiff was discharged the day after her admission.

---

6. Both parties waived their right to jury trial of this preliminary issue.

Plaintiff claims that the rape triggered a complete breakdown. She described making a criminal complaint to the police and seeking legal advice as to the existence of a civil remedy against her father for putting her in the hospital for psychiatric examination. A few days after the incident she left her father's apartment and lived alone for several months. Thereafter, she visited her mother but learned that she regarded her daughter's misfortune as retribution for the sins of the family. (One of the family's sins, according to plaintiff's testimony, was that her mother gave her LSD while still a student.) With money supplied by her mother, plaintiff purchased a ticket to Ireland, then travelled on to Greece and Israel.

Plaintiff returned to this country in 1970 and worked for a short period as a waitress to earn money for another trip to Israel. One of the attractions of Israel lay in the presence there of Rabbi Schlomo Carlebach. The Rabbi testified that he had known plaintiff since 1966–67. His professional experience included counselling young people with drug problems in California and teaching in both New York and Israel. Plaintiff would visit him in both places. He stated that she talked obsessively, although incoherently, about the rape. In other meetings during the next couple of years, she insisted that she possessed cosmic powers, could control the movement of the sun and moon and claimed to have spoken directly with God. Despite these delusions, plaintiff financed her travels herself, and always secured her own passport and visas, and arranged for her luggage and lodging.

A crisis in her mental state occurred at the end of 1970, when she was found wandering the streets of Tel Aviv in the dead of winter. Upon her commitment for several weeks to a mental hospital there, the examining physician concluded that she had suffered a psychotic episode. Apparently, there was no hospitalization upon her return to the United States. By the spring she was working as a secretary. During the period until suit was brought, plaintiff lived by herself for short periods in Washington, D. C., Woodstock, N. Y., New Orleans and Florida working, usually as a secretary. Indeed, on two occasions (early 1973 and mid-1974) she worked as a legal secretary.

The psychiatrist who testified, Dr. Herbert Rosenthal, admittedly did not begin treating plaintiff until almost seven years after the rape. (In fact, except for the few weeks in the Israeli hospital, plaintiff received no treatment or consultations for psychiatric problems after her release from Gracie Square Hospital at the time of the incident.)

In his opinion, plaintiff suffers from schizophrenia coupled on occasion with paranoid delusions, but he views her as a borderline case. He explained that this condition often includes a sense of alienation both from the world in general and from the patient's own emotions. The doctor observed that, during periods when the disease is in remission, schizophrenics may appear to be functioning quite normally. The doctor did not believe, however, that plaintiff's ability to handle travel arrangements and to work signalled that she was capable, in general, of successfully conducting her own affairs. Moreover, on the basis of the medical history supplied by plaintiff, he doubted that there had been genuine periods of remission. In his view, her condition preexisted her college years and persisted to the present day. He did not consider her ability to give not only responsive but also extensive answers to questioning at her deposition and during the hearing as evidence of an overall capacity to comprehend and pursue her legal rights.

In New York, Section 208 of the Civil Practice Law and Rules provides a toll for up to ten years to plaintiffs who are "insane" at the time the cause of action accrues. This extension may also apply to plaintiffs rendered insane by the occurrence which is the basis of the suit. If, however, a plaintiff goes insane from causes unrelated to the suit, no toll arises, and the action is time-barred after the normal limitations period has expired. J. McLaughlin, *Practice Commentaries to the C.P.L.R.* C208:4 (McKinney Supp.1977). Moreover, even if a

plaintiff is found either to have been insane at the time of or rendered insane by the occurrence, the insanity must also be found to have been continuous. In other words, if the plaintiff had a lucid interval of significant duration, preceded and followed by a period of insanity, the toll is lost and is not resurrected when a plaintiff relapses into insanity. *Jordan v. State*, 56 Misc.2d 1032, 290 N.Y.S.2d 621 (Ct.Claims 1968); *Schwartzberg v. Teacher's Retirement Bd.*, 70 N.Y.S.2d 770 (Sup.Ct.1947), *rev'd on other grounds*, 273 App.Div. 240, 76 N.Y.S.2d 448 (1st Dep't 1948), *aff'd*, 298 N.Y. 741, 83 N.E.2d 146 (1948). A final consideration is that the extension granted by the toll is a personal one benefiting only the disabled individual. For this reason, derivative claims must be commenced within the applicable limitations period. *Hall v. E. I. Du Pont De Nemours & Co.*, 345 F.Supp. 353, 385 (E.D.N.Y.1972); *Rivera v. Berkeley Super Wash, Inc.*, 44 A.D.2d 316, 354 N.Y.S.2d 654 (2d Dep't 1974), *aff'd*, 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275 (1975).

█ Applying these principles to this case, which was instituted on January 20, 1975, if plaintiff's insanity existed at or was caused by the alleged rape and continued without interruption until January, 1972, the negligence and warranty claims would be viable; if the state of insanity persisted until January, 1974, the assault claim would be viable. Plaintiff's father's derivative claim for medical expenses and mental anguish, however, was time-barred in 1972 because the toll is personal and, therefore, did not extend the three year statute of limitations.

█ Few cases construe the toll for insanity created by New York's C.P.L.R. § 208. Clearly, the determination does not rest solely upon whether a person is an adjudicated incompetent. *Hammer v. Rosen*, 7 N.Y.2d 376, 198 N.Y.S.2d 65, 165 N.E.2d 756 (1960); *Prude v. County of Erie*, 47 A.D.2d 111, 364 N.Y.S.2d 643 (4th Dep't 1975). Instead, the determination requires an evaluation of all the relevant facts and circumstances, keeping in mind the manifest purpose of the tolling provision to " 're-lieve from the strict time restrictions any person who actually lacks the ability and capacity . . . to pursue his lawful rights.' . . . The word 'insane' in such a statute implies mental disorder resulting in the inability to manage one's affairs." *Hurd v. County of Allegheny*, 39 A.D.2d 499, 502–03, 336 N.Y.S.2d 952, 956 (4th Dep't 1972). This language indicates that the determination of disability should be a pragmatic one, not necessarily based upon medical or psychological classifications alone. Certainly the Court is not required, as urged by plaintiff, to accept the conclusions of plaintiff's expert, retained after the commencement of litigation.

With these considerations in mind, the Court initially must determine whether plaintiff was insane at the time of the rape or rendered insane by it. The mental state of a person is not something capable of precise measurement. Some philosophers contend that there is no such thing as a completely normal person. Variations in emotional outlook are common in all people. The percentage of the population that suffers from a sufficient degree of mental or emotional disturbance to require medical treatment is substantial and would probably be greater were not psychiatric treatment so expensive. Most of them, however, are capable of managing their own personal affairs with a reasonable degree of success. Plaintiff's expert acknowledged that some of the world's most successful people suffered from psychiatric disturbances of one sort or another. Indeed, mental illness may not be as great a burden in making one's way in the world as limited intelligence or lack of education.

The doctor's diagnosis of plaintiff as a borderline schizophrenic is one which, by his own admission, is applicable to many people, most of whom are neither hospitalized nor adjudicated incompetent, and are capable of managing their own affairs. Undoubtedly, the plaintiff suffered from emotional problems before the incident in question, after the incident, and even at this time. The rape, if it occurred as described by plaintiff, surely had an adverse effect

**580**

upon her emotional balance. However, she seems to have been more distressed by her family's lack of belief in her and sympathy to her than by the incident itself. This alienation increased gradually over the following months and years.

In order to be afforded the benefit of the tolling provision, the burden is upon the plaintiff to establish her insanity. The Court finds that plaintiff failed to establish that she was insane at the time of the rape or rendered insane by it. In this regard, the Court views as significant plaintiff's rational response to the rape of cooperating with her assailant to avoid further injury. Following the incident, plaintiff was understandably distressed by her father's refusal to believe she had been raped and his insistence that she had attempted suicide. Nevertheless, the examining physician at the mental hospital believed her version of the events of that night. While he concluded that she was a schizophrenic, he also noted the absence of any psychotic or suicidal response. Moreover, plaintiff attempted to protect her legal rights at the time.

Plaintiff's actions in the succeeding months, while evoking sympathy, demonstrate a considerable facility for taking care of herself. Throughout this period, she travelled extensively throughout Europe, booking passage, renting rooms, and obtaining passports and visas by herself. It was not until over a year and a half after the rape, in January, 1971, that plaintiff had a demonstrable breakdown.

The Court concludes, not without some reluctance, that the picture of plaintiff's condition which emerged from the hearing was of a borderline schizophrenic state which tended to interfere with and shadow her behavior, but which only occasionally erupted in a true psychotic state, so that she was incapable of pursuing her lawful rights. At other times, plaintiff functioned well—going to classes, graduating from college, travelling and working. This view finds further corroboration in the fact that although, in the psychiatrist's opinion, plaintiff's schizophrenic condition had exist-

ed during her college years, she nevertheless graduated from Brandeis with honors.

Moreover, the Court was impressed with the lucidity of plaintiff's testimony. While plaintiff's present mental state is relevant only as it bears upon her mental state at the time of the rape, the psychiatrist testified that plaintiff's condition persists to this day. Her ability to testify clearly and accurately concerning events occurring years ago is some evidence of her capabilities when not suffering a psychotic episode. In addition, her ability to recall the event and its aftermath with such clarity indicates that she was not in a psychotic state at that time.

For these reasons, the Court holds that since plaintiff was not insane either at or immediately after the rape, no toll was created and the statutes of limitations operate as a complete defense to plaintiff's claims. Defendant Levinson's motion to dismiss the complaint is, therefore, granted.

SO ORDERED.