CHRYSLER CORPORATION, Plaintiff,

v.

FEDDERS CORPORATION, Defendant.

No. 78 Civ. 3393 (CHT).

United States District Court,
S. D. New York.

June 10, 1982.

**708**

Kelley Drye & Warren, New York City, for plaintiff; Robert Ehrenbard, Paul F. Doyle, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant; Arthur L. Liman, Leslie G. Fagen, and Weisman Cellar, Spett, Modlin & Wertheimer, New York City, of counsel.

## OPINION

TENNEY, District Judge.

This action grows out of the sale to defendant Fedders Corporation ("Fedders") of the Airtemp Division ("Airtemp") of plaintiff Chrysler Corporation ("Chrysler"). On February 23, 1976, the parties entered into a 76-page agreement (the "Agreement") which set out the numerous terms and conditions of the sale. Fedders was to purchase the assets of Airtemp, including stock in certain domestic and foreign subsidiaries of Chrysler, in exchange for the aggregate of the following: (a) $18,000,000; (b) 1,500,000 shares of preferred stock, Series B, of Fedders; (c) a note in the principal amount of $10,539,965 (the "Note"); and (d) the assumption by Fedders of certain liabilities of Airtemp. The Agreement provided for an adjustment in the purchase terms to reflect any change in Airtemp's net worth between the close of negotiations in the fall of 1975 and the closing on February 23, 1976. Complaint ¶¶ 5-7, and Exhibit A thereto (the Agreement), at 11-17.

In its Complaint, filed July 25, 1978, Chrysler alleged numerous claims for relief. It seeks to recover for services rendered subsequent to the closing date; for interest never paid on the Note; for an adjustment in the Note's principal amount; for dividends never paid on the Series B preferred stock; for conversion of funds mistakenly transferred to Fedders; for Fedders' refusal to accept, or to facilitate, the transfer of stock in several Chrysler subsidiaries, as well as for the failure to pay for some shares that were accepted; and for the failure to meet various liabilities undertaken by Fedders. The Complaint demanded a total judgment in excess of 82 million dollars; in the Amended Complaint, the figure is $85,581,548.16.

On December 18, 1981, with the consent of Magistrate Nina Gershon, who has supervised the pretrial stages of this case, and with the consent of Fedders, Chrysler served a supplemental and amended complaint, which generally revised and updated its original claims and which added a new claim to enforce a prepayment clause in the Note. Chrysler initially pursued its prepayment claim in a separate action filed in New York State Supreme Court in June 1979, two months after the clause was triggered. Affidavit of Robert Ehrenbard, sworn to February 18, 1982 ("Ehrenbard Aff."), at 10. In that action, the trial court denied a motion by Fedders to dismiss the claim, but granted a stay pending the outcome of this case. The Appellate Division

affirmed on the condition that the claim be asserted in this action, to which Fedders consented. In response to Chrysler's amended complaint, Fedders filed an amended answer which, among other things, added its forty-first, forty-second, and forty-third counterclaims, alleging malicious prosecution, abuse of process, and a statutory malicious prosecution claim under Section 600.2907 of the Michigan Revised Judicature Act.

At this time, two motions are before the Court. Chrysler has moved to strike the new counterclaims under Fed.R.Civ.P. ("Rule") 15 as untimely and prejudicial, and under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Simultaneously, Fedders has moved for an expedited trial. The Court will deal with both motions in this Opinion. For the reasons stated below, Chrysler's motion to strike the counterclaims is granted under Rules 12 and 15, and Fedders' motion for an expedited trial is denied, although the Court notes that it does not anticipate any substantial delay between the completion of a pretrial order and the available dates for conducting the trial.

## MOTION TO STRIKE COUNTERCLAIMS

*Background.—*

One of the few facts on which the parties agree is that Chrysler has filed seven lawsuits in the United States in pursuing its rights arising from the February 23, 1976 transaction. Naturally, the parties disagree on the merits and propriety of those actions. Briefly summarized, they are as follows: (1) In November 1977, Chrysler sued Fedders and five other corporations in the Eastern District of Michigan, alleging federal antitrust violations and twenty-two pendent state claims. In February 1978, the district court dismissed the antitrust claims and, with them, the pendent state claims. In March 1981, the Sixth Circuit Court of Appeals affirmed in part and reversed in part the lower court's decision on the applicable antitrust principles, clearing the way for Chrysler to resume its prosecution of the case. Fedders obtained a stay of mandate and petitioned the Supreme Court for a writ of certiorari, and Chrysler cross-petitioned. Both petitions were denied on October 13, 1981, after which Chrysler chose to voluntarily dismiss the Michigan action and pursue all of its claims in this court. (2) While pursuing its Sixth Circuit appeal (which took three years to complete), Chrysler filed its complaint in this court where Fedders is the sole defendant and where jurisdiction rests upon diversity of citizenship under 28 U.S.C. § 1332. The pendent claims dismissed in the Eastern District of Michigan were made pendent claims in this court. (3) On May 19, 1978, Chrysler sued Airtemp Corporation as the sole defendant in a Delaware state court action. According to Chrysler's attorney, this separate case was brought because Airtemp could not be sued in federal court. Ehrenbard Aff. at 8. (4) On July 25, 1978, Chrysler commenced an action in state court in Kentucky, seeking to foreclose a lien on real property located there and valued at $11,-900,000, "which is far less than the full amount" Chrysler seeks. *Id.* at 9. (5) On March 4, 1981, Chrysler filed suit in the federal district court in New Jersey against Fedders and several individuals. The suit "affects title to property located in New Jersey . . . and it is based to a large extent on events which occurred, or were uncovered, well after litigation between Chrysler and Fedders had already begun." *Id.* (6) As the first of two New York state court actions, Chrysler commenced a suit in November 1977, seeking dividends owing on the Series B Preferred Stock. These claims were based upon Fedders' certificate of incorporation and upon the New York Business Corporation Law, not upon the purchase agreement. Over Fedders' strenuous defense and motions to dismiss or stay the action, Chrysler was awarded summary judgment in the amount of $3,900,000. (Aside from the voluntary dismissal in Michigan, the New York state court judgment represents the only resolution in the many cases comprising the course of litigation between Chrysler and Fedders.) (7) In

June 1979, Chrysler brought a second New York state court action, seeking to enforce a prepayment clause in the Note from Fedders. As discussed above, that action was stayed on the condition that the claim be added to this action, which was accomplished by a December 18, 1981 amendment to the complaint.

In its forty-first counterclaim, Fedders alleged that "Chrysler was well aware that its [claim for prepayment of the Note] would or could have been adjudicated in this action[.] ... Nevertheless, Chrysler initiated these unnecessary lawsuits [*i.e.,* the second New York state action and the federal suit in New Jersey] and prosecuted them notwithstanding Fedders' efforts to litigate the issues in one action in one forum." Amended Answer ¶ 20. "Chrysler's repeated assertion of its [prepayment claim] is ... part and parcel, and in furtherance of, a campaign by Chrysler, a corporation many times the size of Fedders, to coerce Fedders into abandoning its rights, through proliferation of lawsuits, splitting of causes of action, and abusive use of process, all in connection with the same February 23, 1976 transaction between Chrysler and Fedders." *Id.* ¶ 21. Fedders quotes the Michigan district court as labeling Chrysler's antitrust action "almost spurious," and it cites Chrysler's complaint in that action as asserting that all of its claims "are derived from a common nucleus of operative facts ...," such that the entire action constitutes a single case which would ordinarily be expected to be tried in one judicial proceeding." *Id.* ¶ 22. After listing Chrysler's six other actions against Fedders, the defendant states that "[u]pon information and belief, Chrysler multiplied its lawsuits not to obtain a speedy adjudication of its alleged claims, but to harass and defame Fedders, to interfere with Fedders' business and property, and to impose unwarranted costs and expenses upon Fedders, all in an effort to obtain unfair advantage and to pressure Fedders." *Id.* ¶ 24. Citing Chrysler's December 11, 1981 voluntary dismissal of the Michigan action, Fedders alleges that Chrysler "has acted maliciously and without probable cause." *Id.* ¶ 26. As to damages

resulting from Chrysler's alleged malicious prosecution, Fedders states that it "should recover from Chrysler the actual damages claimed in the fortieth claim for relief in the Answer and Counterclaims and punitive damages in the amount of $20,000,000.00, plus interest thereon." *Id.* ¶ 28. The damages listed in the fortieth claim for relief in Fedders' original answer, filed August 23, 1978, were as follows:

> As a result of and attributable to Chrysler's breaches of the Agreement and misrepresentations, Fedders has incurred and sustained, and, upon information and belief, will incur and sustain, expenses (including reasonable legal and other fees) in the amount of at least $5,000,000, which would not have been incurred or sustained or required to be incurred or sustained if Chrysler's representations, warranties and covenants had been true and correct.

Answers and Counterclaims ¶ 520.

The forty-second and forty-third counterclaims allege substantially the same underlying facts. The forty-second claim alleges that "Chrysler's repeated assertions of claims in six different Courthouses constitute abuse of process," Amended Answer ¶ 30, for which "Fedders should recover from Chrysler the actual damages claimed in the fortieth claim for relief [quoted above]," as well as punitive damages of 20 million dollars. The forty-third claim adds the following allegation:

> Upon information and belief, the bringing of the Michigan action—and in particular the assertion of a wildly inflated damage claim—had as its purpose and effect a serious adverse impact on Fedders' business and its relationships with suppliers, distributors and lenders. Indeed, one of Fedders' chief banking lenders deemed the Michigan lawsuit an "important" factor in its lending relationship which relationship was later terminated to Fedders' serious detriment.

*Id.* ¶ 33. This conduct, Fedders alleges, violated Section 600.2907 of the Michigan Revised Judicature Act, a statutory ban on malicious prosecution, for which Fedders

seeks the same damages claimed in the forty-first and forty-second counterclaims, as well as "additional damages to be determined at the time of trial." *Id.* ¶¶ 34–35.

In its motion to strike the counterclaims, Chrysler asserts a wide range of reasons for disallowing Fedders' amendments: first, that Fedders never gave notice of its intention to add these claims, nor did it obtain the Magistrate's permission or Chrysler's consent to do so, Ehrenbard Aff. at 4; second, that the claims raise new factual issues—including Chrysler's motivation in bringing its lawsuits, the probable cause underlying its actions, and special damages allegedly suffered by Fedders—as to which Chrysler would need discovery, despite the close of discovery on December 31, 1981, *id.* at 4–6; third, that Fedders' belated amendment of its counterclaims substantially prejudices the plaintiff, *id.*; fourth, that the addition of these claims would needlessly confuse the jury with issues pertaining to the other actions and thereby tend to disparage Chrysler unfairly in the jury's eyes, *id.*; fifth, that, with these claims, Fedders will attempt to put Chrysler's attorneys on trial, in a further effort to sway the jury, *id.*; sixth, that Fedders approaches the Court with unclean hands because it has "attempt[ed] to depict Chrysler's actions as a campaign of harassment while failing to advise the Court that it is responsible for five other actions" involving suits by Fedders' subsidiaries against Chrysler's foreign subsidiaries, *id.* at 7; and seventh, that Fedders' allegations of malicious prosecution and abuse of process fail, under Fed.R. Civ.P. 12(b)(6), to state claims upon which relief can be granted, Plaintiff's Memorandum of Law in Support of its Motion to Strike and Dismiss Defendant's Forty-First, Forty-Second and Forty-Third Counterclaims ("Plaintiff's Memorandum"), at 11.

In response to these arguments, Fedders asserts, first, that it was "absolutely entitled to assert the tort counterclaims in its Amended Answer, in response to Chrysler's Supplemental and Amended Complaint adding plaintiff's new [prepayment claim] for relief and other new matter," Fedders' Memorandum in Opposition to Chrysler's Motion to Strike and Dismiss Fedders' Counterclaims for Malicious Prosecution and Abuse of Process ("Defendant's Memorandum"), at 57; second, that "[Fedders'] defenses [to the prepayment claim] raise all the same facts and issues concerning Chrysler's malicious prosecution and abuse of process," *id.* at 60; third, that Chrysler also will have to face all of the same issues in connection with Fedders' Sixty-Fourth Defense, Amended Answer ¶¶ 36–37, concerning Chrysler's failure to mitigate damages, a defense which Chrysler has not sought to strike, Fedders' Rebuttal Memorandum in Opposition to Chrysler's Motion to Strike and Dismiss Fedders' Counterclaims for Malicious Prosecution and Abuse of Process ("Defendant's Rebuttal Memorandum"), at 5–6; fourth, that no new discovery is required because the claims "involve information entirely within Chrysler's knowledge and control" and because "in any event, Chrysler's discovery against Fedders continues at a back-breaking rate in the New Jersey action," *id.* at 61; fifth, that no prejudice, except potential damages, will result because the jury will already have before it all of the pertinent facts and because "with or without Fedders' counterclaims, plaintiff will have to prove its reasons for suing and in effect will have to demonstrate, if it can, probable cause for asserting these claims," *id.* at 61; sixth, that Chrysler is guilty of unclean hands in that it failed to reveal at a December 10, 1981 conference its intention to dismiss the Michigan action the next day, *id.* at 58; seventh, that if Chrysler had an opportunity to assert a new claim in its amended complaint, Fedders was likewise entitled to assert "new claims, two of which matured only a week before Chrysler amended its complaint [on] December [18], 1981," *id.*; and eighth, that "Chrysler has tried to destroy Fedders' business ... [and that] [i]f Chrysler were to succeed at trial in recovering a judgment for such purported obligations, Chrysler, on its theory, might well eliminate Fedders as a viable entity—and as a litigant—and thus effectively evade responsibility (indeed, be rewarded) for its

wrongful conduct, and thus nullify" the deterrent purposes of permissible recoveries for malicious prosecution and abuse of process, *id.* at 62–63. In addition, Fedders used the bulk of its memoranda in opposition to the motion to describe Chrysler's allegedly ruthless, vicious persecution of Fedders and to justify the adequacy of its counterclaims against a motion to dismiss under Rule 12(b)(6).

*Discussion of the Federal Rules.—*

The appropriate starting point on this motion is Fedders' assertion that it is "absolutely entitled" to add its new counterclaims. (The Court will postpone its discussion of the merits of Fedders' claims until after treating the strictly procedural aspects.) Chrysler brought its motion to strike on the basis of Rule 15, citing the customary factors considered under that provision, including delay, prejudice, and confusion, among others. And Fedders has defended its amendment by citing customary arguments growing out of the words of Rule 15 which directs that "leave [to amend] shall be freely given when justice so requires." In addition, Fedders prominently cited and discussed the case of *Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.*, 50 F.R.D. 415 (D.Del.1970), which rested on the commands of Rule 13 as well as Rule 15. But neither side has fully addressed the interplay of Rules 13 and 15 in this case.

After a party has lost the opportunity to "amend his pleading once as a matter of course at any time before a responsive pleading is served," he "may amend his pleading only by leave of court or by written consent of the adverse party." Rule 15(a). Once permission to amend has been granted, the opposing party is entitled to plead in response within specified time periods. In this case, Chrysler had the Magistrate's permission, as well as Fedders' consent, to file its amended complaint adding the claim for prepayment of the Note. Chrysler argues that its amended complaint adding the prepayment claim was proper under Rule 15(d), which gives the court discretion to allow a party to plead claims growing out of events since the original pleading. Plaintiff's Reply Memorandum at 30; *Owens-Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185 (3d Cir. 1979). But even if the Court so ruled, it must still confront the problem of how broadly Fedders may amend its answer and counterclaims. Professor Moore has said that "a supplemental answer should state new or additional defenses to the claim set forth in the original complaint and should not introduce a new controversy into the case." 3 Moore's Federal Practice ¶ 15.16[4], at 15–251 to –252 (2d ed. 1982). He does not specifically address the problem raised in this case—namely, the permissible scope of a supplemental answer in response to a supplemental complaint—although he notes "that whether or not the adverse party should plead to the supplemental pleading . . . has been left entirely to the discretion of the court." *Id.* at 15–253. Nonetheless, the Court will proceed to consider Fedders' strongest assertion on this motion—namely, that it is *entitled* to present its new counterclaims at this time.

Rule 15 does not by its terms limit the issues that can be alleged in response to an amended pleading. Because the Rule speaks of a "pleading," however, Rule 13 may shed some light on the problem. It directs that "[a] pleading shall state as a counterclaim any claim which . . . the pleader has against any opposing party." Fed.R.Civ.P. 13(a). Besides the breadth of this language, a sense of fair play would suggest that the responder may update his claims in the answering papers. As the court commented in *Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.*, *supra* :

> Since the amending pleader chooses to redo his original work, and receives the benefit of . . . *nunc pro tunc* treatment, he can hardly be heard to complain that claims filed against him are improper because they should have been asserted in response to his original pleading.

50 F.R.D. at 419.

On the other hand, Rule 15 does state that the pleading must be "in *response to*

[the] amended pleading" (emphasis supplied), and Rule 13(a) was not written principally to address the problem of counterclaims asserted in response to amended complaints. In addition, the equitable principle quoted above from *Joseph Bancroft & Sons* must be tempered by the court's additional comments about the case:

> Justice would not be served by striking the counterclaims; serious questions of res judicata would arise from the failure to present them here; and their trial in a separate action would only duplicate much of what will happen here. *No prejudice to defendant appears, and no claim of surprise is made.*

*Id.* (Emphasis supplied).[1] Furthermore, Rule 13's broad requirement that a pleader "shall state ... counterclaim[s]" in his responsive papers applies only to claims existing "at the time of serving the pleading" and only if they "arise[ ] out of the transaction or occurrence that is the subject matter of the opposing party's claim." A pleader must seek the permission of the court to assert claims which were omitted from the original pleading, Rule 13(f), or which matured after the original pleading, Rule 13(e), or which arise out of more recent transactions or occurrences, Rule 15(d). On balance, then, given the treatment of various types of counterclaims under the Federal Rules of Procedure, the Court finds that Fedders does not have a right to assert new counterclaims at this time in the same way that it had a right to assert counterclaims in its original answer. Even if it did, however, Fedders would still have to show that its new claims are either compulsory or at least appropriate permissible counterclaims, which the Court finds they are not, as explained in the margin.[2]

1. In *Joseph Bancroft & Sons, supra*, the defendant *redid* its original work, unlike Chrysler, which amended its complaint to add an after-acquired and separable claim which it had been pursuing in state court. With Fedders' consent and in light of the prepayment claim's close relationship to Chrysler's original complaint, its addition was permitted in this case.

2. Determining whether the new claims are compulsory turns on whether they arise from the same transactions or occurrences underlying the plaintiff's claims. In its memorandum in opposition to the motion to strike, Fedders concedes that, in its response to the amended complaint, it "asserted new claims, two of which matured only a week before Chrysler amended its complaint in December, 1981." Defendant's Memorandum at 58. Presumably, this refers to the common law and statutory claims of malicious prosecution, for which Chrysler's voluntary dismissal in Michigan provides the requisite favorable determination that Fedders must demonstrate as part of its cause of action. See Defendant's Memorandum at 30 **. The claim of abuse of process, by contrast, does not require a showing of a favorable determination. Regarding both claims, however, Fedders clearly intends to present evidence from the whole course of litigation between the parties, indicating that the new counterclaims will call into question many events which have occurred since the time Fedders served its original complaint. The issue here is whether the new claims arise from the original transactions or occurrences underlying this suit.

In this circuit, there is considerable authority supporting a flexible approach to the limitation in Rule 13(a) that counterclaims are compulsory only if they "arise[ ] out of the transaction or occurrence that is the subject matter of the opposing party's claim." *See, e.g., United States v. Aquavella*, 615 F.2d 12 (2d Cir. 1979); *Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057 (2d Cir. 1977). "In practice, this criterion [stated in Rule 13] has been broadly interpreted to require not an absolute identity of factual backgrounds for the two claims, but only a logical relationship." *United Artists Corp. v. Masterpiece Prods., Inc.*, 221 F.2d 213, 216 (2d Cir. 1955). More specifically, "[t]his flexible approach to Rule 13 problems attempts to analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all of the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978).

The facts of *Harris v. Steinem, supra*, provide an apt example of when counterclaims are not considered compulsory, despite the general policy in favor of broad joinder of claims to facilitate a unified resolution of disputes. In that case, the plaintiff alleged violations of the securities laws in connection with the repurchase of her stock in the defendant corporation prior to a profitable sale of the corporation's stock to an outside investor. The defendants counterclaimed for libel based upon the complaint itself, which was alleged to have been "brought maliciously." After the plaintiff discontinued her prosecution of the case, the defendants sought to pursue their counterclaims, which the district court dismissed.

On appeal, the Second Circuit ruled that the counterclaims were not compulsory. After re-

Denied the opportunity to assert its counterclaims as of right, Fedders would urge the Court to exercise its discretion in allowing the amendment, so that all of the parties' contentions can be resolved in a single lawsuit before a single jury. As stated in its memorandum in opposition to Chrysler's motion to strike, Fedders argues that "[t]he case in this Court has become the 'mother' case[.] . . . Severing the malicious prosecution and abuse of process claims from this action would only serve further to proliferate the all-too-multiplicitous litigation between Chrysler and Fedders." Defendant's Rebuttal Memorandum at 6.

Fedders' request to add its claims can be tested under Rule 13(e), which deals with claims maturing after a pleader has served his pleading, or under Rule 15(d) as supplemental claims setting forth transactions or occurrences or events which have happened since the service of the pleading to be supplemented. On the other hand, to the extent that Fedders' claim of abuse of process rests upon the entire history of Chrysler's conduct, it might be viewed as an omitted claim, handled under Rule 13(f), or as an after-acquired or supplemental claim, depending upon when Fedders alleges that Chrysler's permissible assertion of its rights became actionable. In any case, it is hard to imagine that Fedders could not have asserted its abuse of process claim at an earlier date, since this claim did not require a prior favorable determination.

Regardless of which categories are used, however, the Court must still consider the parties' arguments about the proper exercise of judicial discretion in allowing or striking the recently alleged counterclaims. *See generally Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Under each of the provisions involved here, the standards to be applied and the factors to be considered are essentially the same, and the parties' arguments on this motion are

viewing the issues raised by the parties' claims, the appellate court found that "the logical relationship between [the] complaint and [the] counterclaims is at best attenuated," 571 F.2d at 124, because the complaint focused on the material undisclosed financial information known to the defendants, while the counterclaims put in issue (1) whether the individual defendants were public figures, (2) whether the plaintiff's statements were knowingly false or were made with reckless disregard for the truth, and (3) whether the publications were privileged as court pleadings or as accurate reports of judicial proceedings. The Second Circuit ruled that, despite the artful drafting of the counterclaim in terms of libel, it was actually a claim for malicious prosecution, which is premature if filed before a favorable determination in the claimant's favor. Moreover—and of particular importance to this case—the court commented:

> [W]e think that postponement of suits that will ordinarily not arise if plaintiff wins the main action and avoidance of the "dangerous potentialities of counterclaims [in the nature of] malicious prosecutions as a defensive strategem," are strong policy reasons supporting that line of cases.

*Id.* at 125, quoting Wright, "Estoppel By Rule: The Compulsory Counterclaim Under Modern Pleading," 38 Minn.L.Rev. 423, 444 (1954). The court thus found the counterclaim merely permissive and therefore dismissed it for lack of an independent jurisdictional basis, noting that "our decision here does not leave [the defendants] without a remedy . . . for malicious prosecution . . . which [is] based on state law . . . [and] best decided by state courts." 571 F.2d at 125.

In this case, the Court finds that the issues raised by Fedders' new counterclaims—including Chrysler's motivation in bringing several lawsuits, its probable cause for initiating these actions, and Fedders' special damages—are far enough removed from the contractual issues underlying the plaintiff's claims that the counterclaims are not compulsory within the meaning of Rule 13(a). At best, Fedders' counterclaims are permissive, but despite their independent jurisdictional basis under 28 U.S.C. § 1332, they are not appropriately joined in this action because of their untimeliness and prejudicial nature and because of their insufficiency on the merits, as discussed below. In addition, to the extent that Fedders' malicious prosecution claims rest upon litigation other than the Michigan lawsuit, the only one terminated in Fedders' favor, the claims are premature. In any case, both the malicious prosecution and abuse of process claims fall into that category of claims which the Second Circuit warned against in *Harris v. Steinem, supra* —that is, claims which will most likely disappear if the plaintiff wins, which can be sued upon separately in state court if the defendant wins, and which present a dangerous potential for use as a defensive strategem. Bearing all of these factors in mind, the Court finds that Fedders is not "absolutely entitled" to assert its new counterclaims under Rule 13(a) or 13(b).

equally pertinent to each of the applicable sections. See 3 Moore's Federal Practice ¶¶ 13.32, 13.33, 15.07[3], 15.08 (2d ed. 1978 & 1981 Supp.). Furthermore, central to the Court's inquiry is the prejudice, if any, to Chrysler from allowing Fedders' new claims to be asserted at this time.

No one could deny that, with discovery closed and with the parties seeking a prompt trial, Fedders' recent assertion of counterclaims was made late in the day, and even Fedders appears to concede as much when it argues that "the mere passage of time . . . by itself, even to the eve of trial, is not enough to preclude amendment of pleadings where the opposing party fails to demonstrate any real prejudice." Defendant's Memorandum at 59. Where the parties diverge is on the existence of adequate grounds to deny leave to amend despite the language in Rule 15(a) that "leave shall be freely given when justice so requires." In interpreting this phrase, the Supreme Court listed several factors which can justify a denial of leave: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). All but the third of these factors is pertinent to this case.

The cases cited by Fedders on this point can be easily distinguished from this case, as Chrysler readily points out. Plaintiff's Reply Memorandum at 33 *. Briefly reviewed, Fedders' authorities are as follows: *S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 42 (2d Cir. 1979), in which the plaintiff merely wanted to *restate* its claim in terms of breach of contract, in which plaintiff alleged that discovery had been held in abeyance during settlement negotiations, and in which a "trial has not yet commenced and is not likely to do so for some time," *id.* at 42; *Soler v. G. & U., Inc.*, 86 F.R.D. 524, 527 (S.D.N.Y.1980), in which this Court permitted plaintiffs to amend their complaint to allege that violations of the Fair Labor Standards Act during the 1978 harvest season were repeated during the 1979 season; *International Bank v. Price Waterhouse & Co.*, 85 F.R.D. 140, 142 (S.D.N.Y.1980), in which "the only prejudice delay has caused . . . is the necessity for [the defendant] to redo some of the work already done in defending this action" and in which this inconvenience "appear[ed] to be minimal when compared to that which would be caused to [the plaintiff] if [it] were denied the opportunity to present completely its claims against these defendants arising out of this transaction," *id.; Manhattan Fuel Co. v. New England Petroleum Corp.*, 422 F.Supp. 797 (S.D.N.Y.1976), in which the court commented that "[a]lthough two years have passed since the completion of discovery, defendants have not alleged any injury as a result of this delay in requesting an amendment [to assert a claim for quantum meruit, which is] . . . based on the same facts, transactions and occurrences underlying the contract claim; it occasions neither surprise nor the need for additional discovery," *id.* at 802; and *Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255 (E.D.Pa.1976), in which the court allowed the plaintiff to assert a claim for punitive damages by amendment on the eve of trial because "the facts on which the previously unasserted claim was based were all known or available to all parties" and therefore raised no threat of prejudice, *id.* at 267.

■ Although the Court finds these authorities unpersuasive for Fedders' argument, they are nonetheless helpful to the Court because they point out many factors—notably absent from this case—which would justify permitting a belated amendment of claims. More specifically, *if* a party is merely restating a claim already in issue, or *if* discovery has not proceeded very far, or *if* a trial is not imminent, or *if* a party merely seeks to add new instances of prior statutory violations, or *if* the pleader would lose its claim unless it is added to the present suit, or *if* the opposing party alleges only delay without alleging prejudice, or *if* the new claim requires no new facts to be

tried on the merits, *then* a trial court would be unwarranted in denying leave to amend. *None* of these conditions inheres in this case, however; indeed, Chrysler expressly and forcefully alleges that these facts are missing and that these as well as other considerations, all supported by authority, warrant striking Fedders' new counterclaims. In addition, Chrysler has cited to this Court a decision by the Third Circuit Court of Appeals explicitly refusing to follow the result reached in *Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.,* *supra,* on which Fedders seems to place primary reliance. See Defendant's Memorandum at 57–58. *Owens-Illinois, Inc. v. Lake Shore Land Co.,* 610 F.2d 1185, 1188 (3d Cir. 1979). There, the court noted that "[m]ore than just the lapse of time [is] implicated.... Allowance of the counterclaim would doubtless have set off a new wave of discovery before trial could commence. The court had ample reason to believe that the counterclaim was interposed at such a late date in order to delay final disposition of the request for specific performance.... Moreover, the dismissal was without prejudice to the defendant's right to seek damages in a separate suit for breach of the lease agreement." *Id.* at 1188. Similar considerations in this case cause the Court to conclude that the result in *Owens-Illinois* is a more appropriate one than the result in *Joseph Bancroft & Sons Co.*

Delay, accompanied by prejudice to the opposing party, is a fully adequate reason for denying leave to amend, a principle repeatedly endorsed in prior cases. *See, e.g., Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1087 (2d Cir. 1977) (disallowing an eve-of-trial amendment changing plaintiff's theory which would have forced defendant to prepare a new factual case causing it substantial prejudice); *Rogers v. Valentine,* 426 F.2d 1361, 1363 (2d Cir. 1970); *Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152, 1155 (2d Cir. 1968); *Middle Atlantic Utilities Co. v. SMW Dev. Corp.,* 392 F.2d 380, 384 (2d Cir. 1968); *Stiegele v. J.M. Moore Import-Export Co.,* 312 F.2d 588, 595 (2d Cir. 1963)

(rejecting last-minute anti-trust defense in patent suit); *Graboi v. Kibel,* 432 F.Supp. 572, 575 (S.D.N.Y.1977). In this case, the plaintiff has clearly and convincingly described several forms of prejudice which would result from allowing Fedders' amendment. First, the claims involving misuse of the legal process would necessarily call into question many factual and legal issues not now part of the suit, including whether Chrysler had probable cause for bringing its lawsuits, whether Chrysler acted with malice in bringing several suits, whether Fedders has suffered special damages within the meaning of its claims, and whether any damages suffered were proximately caused by Chrysler's alleged wrongdoing. Moreover, the jury in this suit would have to consider the various legal theories proposed in Chrysler's other suits, some of which are not part of the case in this Court, including antitrust claims and real property liens. These new issues would surely protract and complicate the upcoming trial with a substantial risk of confusing the jury and of unfairly prejudicing the jury against Chrysler in its claims in this suit. *Matarazzo v. Friendly Ice Cream Corp.,* 70 F.R.D. 556, 560–61 (E.D.N.Y.1976) (disallowing addition of state claims for fraud, breach of contract and breach of fiduciary duties to existing federal antitrust claims which "would only becloud the antitrust issue and would confuse the jury in resolving the same"); *United States v. Eight Tracts of Land,* 270 F.Supp. 160, 164–65 (E.D.N.Y.1967) (forbidding amendment which "would unnecessarily prolong the trial with issues which could be more properly determined in a separate action" and by which the jury "could easily be misled and confused" by the new issues involved). Furthermore, the jury will already have its work cut out for it in handling all of the issues to be litigated in the three weeks proposed for this trial. To ask the jury to consider the other suits filed between the parties would needlessly and unfairly burden its deliberation. It is unavailing to argue, as Fedders does, that "with or without Fedders' counterclaims, plaintiff will

have to prove its reasons for suing and in effect will have to demonstrate, if it can, probable cause for asserting these claims." Defendant's Memorandum at 61. The term "probable cause," as used in connection with Fedders' counterclaims, focuses on Chrysler's internal understanding of the legitimacy of its claims at the time they were asserted, whereas the plaintiff's claims as now formulated will focus on the contract and the parties' conduct under that Agreement. Although many of the same facts must be considered for both claims, the use to which those facts will be put, as well as the burdens of proof, will vary significantly. This further convinces the Court that Fedders' counterclaims are inappropriately joined in this case. In short, even though Chrysler must "in effect" demonstrate the probable cause for its claims, *in actuality*, the jury need only consider the facts surrounding the February 23, 1976 transaction, *not* Chrysler's motive and Fedders' damages, if any, caused by this and other lawsuits.

Each side has accused the other of unclean hands, which they allege to warrant denial of the opposing requests. Chrysler asserts that "[f]or some reason, Fedders has neglected to mention that it has, in the last several years, caused its subsidiaries to sue Chrysler subsidiaries in Canada, the United Kingdom, France, Spain and South Africa." Ehrenbard Aff. at 7. In a similar vein, Fedders argues that "[h]ere ... Chrysler was afforded the opportunity to add *its* new claim at the close of discovery, *a claim it had every opportunity to make in this case years ago.*" Defendant's Memorandum at 58. Moreover, Fedders complains that Chrysler failed to notify the Magistrate and the defendant at a December 10, 1981 conference of its intention to abandon its suit in Michigan the next day. *Id.* First, Chrysler did not have to preview its strategy. Second, although joinder here would have been appropriate, Chrysler was free to pursue its separate state court claim under the prepayment clause in an effort to obtain a speedy recovery on the Note. Fedders sought to delay a state determination by moving for a stay which was granted on

the condition that the prepayment claim be added to this action. Fedders gave its consent, as well it should in light of its interest in resolving all claims in one action. *Id.* at 63. But this background does not mean that Chrysler is now obliged to accept, nor that the Court must permit, the addition of prejudicial issues which will bloat and complicate the anticipated trial.

Fedders alleges a form of implied consent by Chrysler to the new counterclaims in that the plaintiff has not moved to dismiss or strike Fedders' defenses against the prepayment claim and other claims under the contract. Defendant's Memorandum at 60. Chrysler objects to this characterization, asserting that "[t]hey do not constitute excuses, mitigating circumstances, or otherwise impact in any way on the validity of Chrysler's claims." Plaintiff's Reply Memorandum at 34. The Court agrees with Chrysler that the new counterclaims are requests for affirmative relief, not defenses to the plaintiff's request for damages. To the extent that Fedders can prove Chrysler's failure to mitigate its damages, if any, the Court will entertain such evidence, but by interposing a defense of failure to mitigate, Fedders is not thereby entitled to present all evidence that would be relevant to a claim of malicious prosecution or abuse of process. Its defenses may be substantiated only by evidence which meets the requirements of the Federal Rules of Evidence. *See, e.g.,* Fed. R.Evid. 401, 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

In ruling on proposed amendments, it is appropriate "if necessary, [to] weigh [any prejudice to the opposing party] against any prejudice to the [amending] party if amendment were not permitted." 3 Moore's Federal Practice, supra, ¶ 15.08[4], at 15–86 (footnote omitted); *International Bank v. Price Waterhouse & Co., supra,* 85 F.R.D. at 142. Upon balancing the prejudice to the

parties in this case, the Court finds that Chrysler clearly presents the more persuasive and sympathetic arguments. Ultimately, if Fedders prevails in this case, it can easily—and much more forcefully—assert its claims for malicious prosecution and abuse of process in a subsequent state court action; indeed, Fedders' own characterization of the suit here as "the 'mother' case" reinforces the Court's decision to let the defendant file a separate suit on these claims, if need be.[3]

*Discussion of the Merits.—*

Fedders bases its counterclaims on common law principles of malicious prosecution and abuse of process and on Section 600.-2907 of Michigan's Revised Judicature Act which authorizes an award of treble damages, as well as criminal penalties, against a "person who shall, for vexation and trouble or maliciously, cause or procure any other to be arrested, attached, or in any way proceeded against, by any process or civil or criminal action, or in any other manner prescribed by law."

■ The parties appear to agree on the essential elements of a cause of action for malicious prosecution, although they disagree on the application of these elements to the facts of this case. Both sides cite *Belsky v. Lowenthal*, 62 App.Div.2d 319, 321, 405 N.Y.S.2d 62, 64 (1st Dep't. 1978), *aff'd.*, 47 N.Y.2d 820, 418 N.Y.S.2d 573, 392 N.E.2d 560 (1979), where the First Department wrote that

> in order to state a cause of action for malicious prosecution plaintiff must establish certain essential elements to wit: that defendant commenced or continued a proceeding against the plaintiff; that such proceeding terminated in plaintiff's favor; that there was no probable cause for the action and that the proceeding was instituted with actual malice; and that there must have been some interference with plaintiff's person or property ... such as by use of such incidental remedies as attachment, arrest or injunction ....

On the facts of the case—the defendants had been plaintiffs in a prior medical malpractice action which was discontinued with prejudice by stipulation—the Appellate Division affirmed the lower court's finding that "the complaint cites no interference with plaintiff's [former defendant's] person or property," *id.*, because the former plaintiffs had only filed a complaint and had not resorted to any provisional remedies which interfered with the former defendant's person or property.

Regarding Michigan law, Fedders proceeds under Section 600.2907 of the Revised Judicature Act, quoted in pertinent part above. A Michigan appellate court recently commented that there is a "paucity of case

---

**3.** Fedders makes one very odd argument in its memorandum:

> [T]here is a substantial policy reason for adjudicating the malicious prosecution and abuse of process claims in this action. In effect, Fedders has alleged that Chrysler has tried to destroy Fedders' business by the abusive proliferation of litigation and other tactics. Chrysler's moving papers say that plaintiff seeks recovery of allegedly "liquidated" obligations far in excess of Fedder's [sic] net assets. If Chrysler were to succeed at trial in recovering a judgment for such purported obligations, Chrysler, on its theory, might well eliminate Fedders as a viable entity—and as a litigant—and thus effectively evade responsibility (indeed, be rewarded) for its wrongful conduct, and thus nullify ... the "deterrent effect" of the availability of those torts.

Defendant's Memorandum at 62–63. Chrysler responds: "Chrysler's prevailing, as it has already done in the New York State action for dividends, will further demonstrate that far from being wrongful, its actions were perfectly proper and only steps that it prudently had to take to protect its interests as Fedders' largest creditor and shareholder." Plaintiff's Reply Memorandum at 38–39.

Although the Court will not condone at this time all of Chrysler's actions, the chance that Chrysler will prevail at trial is a prime reason to exclude such claims from the case. The fact that Chrysler is seeking damages in excess of Fedders' net worth is meaningless in judging the plaintiff's abuse of process, although it goes a long way in explaining Chrysler's aggressive pattern of litigation. Moreover, if Fedders wants to pursue a claim of abuse of process despite Chrysler's victory at trial—a claim of malicious prosecution being out of the question—the Court is confident that a successor in interest or a trustee in bankruptcy will be available to consider such litigation.

law interpreting this 130-year-old statute," which it called "inarticulately drafted." *Peisner v. Detroit Free Press*, 68 Mich.App. 360, 242 N.W.2d 775, 777 (1976) (considering statute's effect on common law action for abuse of process, discussed below). Another appellate court applied the statute to a malicious prosecution claim and wrote:

> We are forced to conclude that the *enactment provided only an additional method of computing punitive damages*. Certainly it added nothing to the substantive law when it recited that to be entitled to treble damages the procuring of the arrest had to have been done *maliciously*.
>
> \* \* \* \* \* \*
>
> ... This, our Supreme Court has repeated times without number:
>
>> "To maintain a suit for malicious prosecution three distinct propositions must be established:
>>
>> "*First*. The fact of the alleged prosecution and that it has come to a legal termination in the plaintiff's favor.
>>
>> "*Second*. That the defendant had not probable cause.
>>
>> "*Third*. That he acted from malicious motives." (*Hamilton v. Smith* [1878], 39 Mich. 222, 225.)

*LaLone v. Rashid*, 34 Mich.App. 193, 191 N.W.2d 98 (1971) (emphasis supplied). *Accord, Peisner v. Detroit Free Press, supra* ("we are firmly convinced that the purpose of this statute is to permit a person with a valid common law cause of action [for abuse

of process] to recover treble damages."). In addition to the elements listed above, Michigan courts, like New York courts, have uniformly required a showing that the former plaintiff or criminal complainant had interfered with the former defendant's person or property. *See, e.g., Rowbotham v. Detroit Automobile Inter-Insurance Exchange*, 69 Mich.App. 142, 244 N.W.2d 389, 392 (1976) (defendant filed an improper certificate of unsatisfied judgment with the state motor vehicle department, causing an unjustified suspension of Rowbotham's driver's license); *Taft v. J.L. Hudson Co.*, 37 Mich. App. 692, 195 N.W.2d 296, 299 (1972) (retail store detectives caused detention and subsequent criminal prosecution of plaintiffs); *Leeseburg v. Builders Plumbing Supply Co.*, 6 Mich.App. 321, 149 N.W.2d 263 (1967) (writ of attachment); *Brand v. Hinchman*, 68 Mich. 590, 36 N.W. 664 (1888) (writ of attachment); and other cases cited and discussed in *Friedman v. Dozorc*, 412 Mich. 1, 312 N.W.2d 585, 596–600 & nn. 25–33 (1981).

Fedders spends several pages in its answering brief arguing that Chrysler's voluntary dismissal in Michigan constitutes a termination in its favor and that the defendant has adequately alleged malice and lack of probable cause. Defendant's Memorandum at 47–51. Chrysler, however, does not vigorously contest the question of a termination favorable to Fedders and does not base its motion to dismiss on the issues of malice and lack of probable cause[4] (al-

---

4. Regarding a favorable termination, Chrysler notes the requirement and then comments that "[t]he only action which has been terminated is the action in ... Michigan, which was voluntarily discontinued by Chrysler." Plaintiff's Reply Memorandum at 4. "Accordingly, the only possible prior litigation as to which Fedders could even conceivably have a cause of action for malicious prosecution is [that] action." Plaintiff's Memorandum at 14. With these statements, Chrysler appears to express some doubt about the ripeness of Fedders' claims, but generally it concedes that its voluntary discontinuance can underlie a malicious prosecution claim, a proposition supported by New York cases. *Levy's Store, Inc. v. Endicott-Johnson Corp.*, 272 N.Y. 155, 162, 5 N.E.2d 74 (1936); *Aguilina v. O'Connor*, 59 App.Div.2d 454, 455, 399 N.Y.S.2d 919, 921 (3d Dep't 1977).

At the same time, however, Chrysler does not concede that the cause of action based upon the Michigan case allows Fedders to introduce evidence with regard to the other six cases. Indeed, Chrysler points out that Fedders has argued that all seven cases "are but a single litigation campaign brought against defendant.... All of these lawsuits must be taken together, and as such, constitute malicious prosecution." Defendant's Memorandum at 55 \*. Chrysler argues that "Fedders, revealingly, has cited no authority for its unique proposition that disparate litigations, brought under different circumstances, should be treated as a single lawsuit. In any event, if all these actions *are* to be treated as one, then there clearly has been no favorable termination because that 'one suit' is still pending." Plaintiff's Reply Memorandum at 10–11. The Court notes with interest that Fedders' reference to "a single

though it hastens to note its strenuous opposition to Fedders' rendition of the facts of the parties' relations, Plaintiff's Reply Memorandum at 11*). The Court will therefore proceed directly to the crux of the dispute here: whether Fedders has suffered (and alleged) interference with its person or property (also called "special injury"), within the contemplation of the courts of New York and Michigan.[5]

Fedders argues that "[w]hile this [interference] element of the tort can be satisfied by an allegation concerning use of provisional remedies, such an allegation is only *one of many* which satisfies the interference-with-property requirement." Defendant's Memorandum at 51 (emphasis in original). This interpretation is not foreclosed by the law of New York and Michigan. In *Belsky v. Lowenthal, supra*, the court stated that "there must have been some interference with plaintiff's person or property . . . *such as* by use of such incidental remedies as attachment, arrest or injunction," 405 N.Y.S.2d at 64 (emphasis supplied), *citing Williams v. Williams*, 23 N.Y.2d 592, 298 N.Y.S.2d 473, 246 N.E.2d 333 (1969). *Accord, Burt v. Smith*, 181 N.Y. 1, 5, 73 N.E. 495, 496 (1905); *Kalso Systemet, Inc. v. Jacobs*, 474 F.Supp. 666, 670 (S.D.N.Y.1979). Similarly, the Michigan statute speaks of a plaintiff who has been "arrested, attached, or *in any way proceeded against, by any process* or civil or criminal action, or *in any other manner prescribed by law*," (emphasis supplied), and Michigan cases have also used nonexclusive language when describing the interference with person or property that will satisfy the common law element of the cause of action. *See, e.g., Friedman v. Dozorc, supra*, 312 N.W.2d at 598–99 ("the plaintiff [must have] suffered some special injury *equivalent to* a seizure of

property as a result of the defendant's institution of civil proceedings" (emphasis supplied)).

On the other hand, cases applying the common law elements of malicious prosecution, in New York and in Michigan, have generally presented clear instances of provisional remedies, "such as" attachment or garnishment, and the Michigan courts have held that Section 600.2907 does *not* change the common law elements of a malicious prosecution claim, but only provides a choice for the plaintiff, who may decide between sending the issue of punitive damages to the jury or having the court treble an award of compensatory damages arrived at by the jury. (Indeed, many of the cases discussing the statute have involved only whether the jury had considered punitive damages; if so, the plaintiff is not entitled to a trebling of their award. *See, e.g., Taft v. J.L. Hudson Co., supra; LaLone v. Rashid, supra*. But the independent vitality of the common law claim is demonstrated by those cases discussing, often in great detail, the essential elements of the cause of action without ever mentioning the statute. *See, e.g., Friedman v. Dozorc, supra*.) In addition, as Chrysler argues, the open-endedness of the phrase, "such as" and "in any other manner," cannot be used to divorce the legal requirements from their roots. Plaintiff's Reply Brief at 7*. Applying the principle of ejusdem generis—that a general phrase following a list is limited by the characteristics of the items in the list—the interference requirement can have some flexibility, but it must still be limited to "damage differing in kind from the ordinary burden of defending a lawsuit." Prosser, Law of Torts at 852 & nn. 12–13, 15 (4th ed. 1971) (listing New York and Michi-

litigation campaign" accords with its reference to the suit in this Court as "the 'mother' case." Defendant's Memorandum at 63.

5. In *Friedman v. Dozorc, supra*, the Supreme Court of Michigan referred to the interference-with-property element as a requirement that the plaintiff allege and prove "special injury." As the court explained: "No decision of this Court holds that an action for malicious prosecution of civil proceedings can be maintained

absent special injury, whatever the precise boundaries of that concept." 312 N.W.2d at 599–600. This conclusion followed a detailed discussion of prior decisions in the Michigan courts which have always required "that the facts of [the] case demonstrate[ ] a technical or constructive seizure of property." *Id.* at 597. The Court finds this view essentially identical to the view of the New York courts, whose decisions are discussed hereinafter.

gan among those jurisdictions requiring such qualitatively different injury).

Fedders' argument for finding an interference in this case relies on a handful of authorities discussed in its memorandum of law, Defendant's Memorandum at 51–55, and the facts on which it relies are handily summed up in its Rebuttal Memorandum at 2:

> No prior decision—cited by either side—involved as many as seven lawsuits brought by one party, and no prior decision involved anything like the relentless accumulation of threats, multiple lawsuits, restraints on property, phone calls to lenders, frivolous *ad damnums*, overbearing and unnecessary discovery, and other coercive tactics designed to intimidate a small company into submission.

Fedders cites the following precedents in support of its view: *Groat v. Town Board of Glenville*, 73 App.Div.2d 426, 426 N.Y.S.2d 339 (3d Dep't 1980); *Fulton v. Ingalls*, 165 App.Div. 323, 151 N.Y.S. 130 (2d Dep't. 1914), *aff'd.*, 214 N.Y. 665, 108 N.E. 1094 (1915); *J.J. Theatres, Inc. v. V.R.O.K. Co.*, 96 N.Y.S.2d 271 (Sup.Ct., N.Y.Co. 1950); *New England Tire & Sales Co. v. Kelly-Springfield Tire Co.*, 123 Misc. 954, 207 N.Y.S. 95 (Sup.Ct., Kings Co. 1924); *Soffos v. Eaton*, 152 F.2d 682 (D.C.Cir.1945).[6]

The first two cases in this list support Chrysler's position that, where provisional remedies were not invoked, the malicious prosecution claimant must point to interference with person or property equivalent to a provisional remedy; the last three do not support Fedders' position. In the *Groat*

and *Fulton* decisions, claims of malicious prosecution were brought by police officers who had been charged with criminal misconduct. As a result, they were "suspended without pay, dismissed from the force and, at least temporarily, disgraced in the department and the community." This, the courts specifically found, satisfied the requirement that the plaintiff demonstrate an interference with person or property. *Groat v. Town Board of Glenville, supra*, 426 N.Y.S.2d at 341; *Fulton v. Ingalls, supra*, 151 N.Y.S. at 132. These cases are similar, on their facts, to the Michigan decision in *Rowbotham v. Detroit Automobile Inter-Insurance Exchange, supra*, in which a temporary suspension of a driver's license because of the defendant's wrongful use of a regulatory statute satisfied the interference requirement. In each of these, the malicious prosecution claimant's customary conduct was interrupted, to his significant embarrassment and detriment, because of the collateral legal effects *flowing directly* from the wrongful institution of civil proceedings. In this case, Fedders suffered only those sorts of encumbrances which may reasonably be expected to flow from complex, vigorously fought litigation.

The opinion in *J.J. Theatres, Inc. v. V.R.O.K. Co., supra*, states that "plaintiff concedes that the bringing of suits does not amount to malicious prosecution." 96 N.Y.S.2d at 273. When the court goes on to state that "[e]ven lawful acts if done maliciously and with intent to injure can be the subject of a cause of action," it is referring to the theory of prima facie tort, as indi-

---

**6.** Regarding the Michigan statute, Fedders cites *Rivers v. Ex-Cell-O Corp.*, 100 Mich.App. 824, 300 N.W.2d 420 (1980); *Peisner v. Detroit Free Press, supra*; *Taft v. J. L. Hudson Co., supra*. The *Rivers* decision involved a prior criminal prosecution in which the party defending against the malicious prosecution charge had failed to disclose exculpatory information to the police. For support, the *Rivers* court cited *Ringo v. Richardson*, 88 Mich.App. 684, 689, 278 N.W.2d 717, 719, *leave den.*, 407 Mich. 906 (1979), another case involving a prior criminal prosecution. Neither of these adds any weight to Fedders' argument that interference can be based upon the burdens and conduct of litigation short of provisional remedies. Similarly,

*Peisner* and *Taft* are of no help to Fedders; *Peisner* involved a newspaper's counterclaim of malicious prosecution which was premature because it grew out of the very suit in which it was asserted, and *Taft* involved the physical detention of two men and their subsequent criminal prosecution.

Regarding the Michigan claims, therefore, Fedders is left with its reference to the arguments made in connection with New York law, which "allege[ ] each of [the] elements, including special injury in the nature of interference with Fedders' property and business," a position for which it finds support in the broad language of the 130-year-old statute. Defendant's Memorandum at 57.

cated by its citation of *Opera on Tour, Inc. v. Weber*, 285 N.Y. 348, 34 N.E.2d 349 (1941), and *Al Raschid v. News Syndicate Co.*, 265 N.Y. 1, 191 N.E. 713 (1934) (administrative proceedings under the immigration laws do not constitute judicial proceedings for purposes of malicious prosecution, but defendant may "be legally responsible for maliciously circulating or giving false information resulting in intentional injury to another," 265 N.Y. at 3–4, 191 N.E. 713). In addition, as pointed out by Chrysler, *Belsky v. Lowenthal, supra*, severely undercuts the rationale of *J.J. Theatres, Inc.* Plaintiff's Reply Memorandum at 8*. In *Belsky*, the court warned against "hold[ing] that plaintiff may not prevail on a cause of action, having failed to establish certain elements, which are essential thereto, and then in the exercise of flexibility, apply a different name to it, and without correcting any of the fatal defects, permit the cause of action (*absent a unique quality*) to stand" (emphasis supplied). Perhaps *Belsky* and *J.J. Theatres* can be reconciled by applying the underscored language to another fact which distinguishes *J.J. Theatres* from this case—namely, that the defendants there were alleged to have brought six *baseless* lawsuits, for the *sole* purpose of harassment, *all* of which had already been resolved in the plaintiff's favor.

The opinions in *Soffos v. Eaton, supra*, and *New England Tire & Sales Co. v. Kelly-Springfield Tire Co., supra*, are somewhat difficult to decipher, but the Court is nonetheless convinced that they do not alter the great weight of authority on Chrysler's side regarding the interference requirement. In *Soffos v. Eaton*, the plaintiff alleged that the defendant instigated four successive, baseless suits (two brought in his own name and two in the name of his daughter to whom the property was sold), *all* of which were resolved in plaintiff's favor. After citing the general rule that a malicious prosecution claim requires an allegation of interference with person or property, the court ruled that two prior suits, brought maliciously and without probable cause, already terminated in the prior defendant's favor, may support a cause of action. The

rationale was stated as follows: "No one is likely to be deterred from litigating an honest claim by fear that some future jury may erroneously decide that he has brought *two* suits maliciously and without probable cause." 152 F.2d at 683 (emphasis in original). Whatever the wisdom of this rule, whatever its exact breadth, and whatever its current status in the District of Columbia, it does not state the law of New York or Michigan, and even if it did, the facts of this case are easily distinguishable from the facts of *Soffos v. Eaton* where multiple suits had already been decided in plaintiff's favor.

The one-page opinion in *New England Tire & Sales Co., supra*, does not spell out exactly what happened in the case or how. The case clearly holds that a corporation as a legal entity may bring an action for malicious prosecution, since "[t]here does not seem to be any difference in principle between an action for libel [which corporations were held capable of asserting] and one for malicious prosecution." 207 N.Y.S. at 96. As pointed out in Chrysler's reply brief, the two cases cited in support of this proposition, *St. Johnsbury & Lake Champlain R.R. Co. v. Hunt*, 55 Vt. 570 (1882), and *Bucki & Son Lumber Co. v. Atlantic Lumber Co.*, 121 F. 233 (5th Cir. 1903), were predicated upon an arrest and an attachment, respectively, two traditional bases for malicious prosecution claims. Then, turning to the sufficiency of the complaint, the court wrote:

> . . . While some of the allegations with respect to damage cannot be affected by the prosecution, and, therefore, are not the subject of damage, it is alleged that the credit and business of the corporation have been irreparably damaged, and, in addition, that it expended money for counsel fees for its defense.

207 N.Y.S. at 96. Without discussing any legal principles or the exact facts alleged with respect to the damages suffered or how they were caused, the court let the complaint stand. It is impossible for this Court to disregard the weight of judicial authority and expert opinion on the ele-

ments of a malicious prosecution claim on the strength of a 67-year-old cursory opinion issued by a trial court which did not cite any authority or offer any legal discussion on the point at issue here.

Fedders alleges that Chrysler has interfered with its property in filing multiple lawsuits, contacting its lenders, protracting discovery, restraining its property, and generally threatening and coercing Fedders into submission. Defendant's Rebuttal Memorandum at 2. Central to these allegations is the number of lawsuits: "In sum, Chrysler's very duplication of lawsuits—even apart from the financial harm specifically alleged by Fedders—constitutes an 'interference with property' sufficient to sustain the malicious prosecution cause of action." Defendant's Memorandum at 54–55. Then, in a footnote to this statement, Fedders notes that Chrysler has imposed lis pendens in Kentucky and New Jersey on some of Fedders' property.

Although a lis pendens has been held to constitute an interference with property, *Chappelle v. Gross*, 26 App.Div.2d 340, 274 N.Y.S.2d 555, 557–58 (1st Dep't 1966); *Metromedia, Inc. v. Mandel*, 21 App.Div.2d 219, 249 N.Y.S.2d 806, 810 (1st Dep't 1964), because of its restraint on the sale of property, that encumbrance is only actionable once the victim has been vindicated in *those actions* in which the lis pendens was used. Thus, in *Schierloh v. Kelly*, 253 App.Div. 373, 375, 2 N.Y.S.2d 188, 190 (2d Dep't 1938), the court wrote: "Taking the allegations in the complaint at their face, the lis pendens in each of the Kelly actions did interfere with plaintiff's property. *Those actions* terminated favorably to the defendants therein, including the present plaintiff, by judicial action." (Emphasis supplied). Similarly, in *Metromedia, Inc. v. Mandel, supra*, the court wrote: "If there was wrong in the issuance of the process and malicious interference with the property of the plaintiff so as to constitute malicious prosecution, that can only be determined after trial of the action in Missouri [where the lis pendens was imposed]" because the claim would be for injuries suffered "in connection with" the use of the provisional remedy. 249 N.Y.S.2d at 810. In sum, despite the use of the lis pendens in Kentucky and New Jersey, those provisional remedies cannot be asserted to satisfy the requirement of interference with Fedders' property in the Michigan action.

The other factual allegations, while unfortunate, do not strike the Court as being outside the realm of ordinary burdens suffered by litigants. Regarding Chrysler's purported threats of putting Fedders into bankruptcy, a "form of leverage" that Fedders concedes Chrysler "decided not to apply," Defendant's Memorandum at 13, the Court is persuaded by Chrysler's counsel's statements in his reply affidavit that this possible course of action was merely reviewed by one of the plaintiff's officers who recommended against it and whose memorandum said it "should obviously be used only as a last resort." Reply Affidavit of Robert Ehrenbard, sworn to April 12, 1982 ("Ehrenbard Reply Aff."), at 19–20. Similarly, the Court finds that Chrysler's inquiries to Fedders' other creditors and its contacts with officers and directors of Fedders were perfectly reasonable in light of Chrysler's enormous claims against the company and in light of Chrysler's right to dividends on its preferred stock, a right upheld by the New York Court of Appeals which wrote that "Fedders's various counterclaims and affirmative defenses, essentially alleging that Chrysler overstated the value of Airtemp assets, do not provide a basis for eliminating Fedders's duty to the Series B dividends.... If the assets' value is found to have been overstated, Fedders's remedy is one for damages under the contract and not an avoidance of the independent obligation to pay dividends on the Series B shares." *Chrysler Corp. v. Fedders Corp.*, 51 N.Y.2d 953, 435 N.Y.S.2d 700, 701, 416 N.E.2d 1036 (1980) (basing the decision on New York law and Fedders' certificate of incorporation). See also Ehrenbard Reply Aff., Exh. A (copies of letters to creditors).

Fedders is left, therefore, with complaining about the multiplicity of lawsuits and the allegedly oppressive discovery tactics. The Court finds that neither of these war-

rants damning of Chrysler's conduct without some concrete showing of an interference with Fedders' business operations, beyond the demands of defending the actions, and that the cases in New York and Michigan would not recognize an action for malicious prosecution under these circumstances. *See, e.g., Friedman v. Dozorc, supra,* 312 N.W.2d at 589 (plaintiff's allegations of injury held insufficient where they only claimed as damages: "the cost of defending the aforesaid cause and the appeal, an increase in his annual malpractice insurance premiums for so long as he practices medicine, the loss of two young associates from his office who could no longer afford to pay the increased malpractice premiums thereby requiring him to work excessive hours without relief, damages to his reputation as a physician and surgeon, embarrassment and continued mental anguish."); *Lincoln First Bank of Rochester v. Siegel,* 60 App.Div.2d 270, 400 N.Y.S.2d 627, 634 (4th Dep't. 1977) (despite plaintiff's allegation that he had suffered an improper arrest on criminal charges, summary judgment granted to defendant because plaintiff's claims of humili-

ation, embarrassment, business impairment, and loss of financing were "couched in broad and conclusory terms. Siegel did not allege how he was damaged in obtaining financing and bonding; he did not allege who denied him such financing and bonding or what enterprises were involved; nor did he allege in what amounts he was specifically injured as a result of these refusals."). By the same token, Fedders' counterclaims allege as damages the same injuries alleged in its original answer. These damages are alleged in a highly conclusory fashion and the vast proportion of them would be out-of-date on the counterclaims. Moreover, accepting as true Fedders' representation that its lenders have considered Chrysler's suit very seriously in deciding on their future credit relations, absent very specific allegations about Chrysler's blameworthiness for the lenders' actions, there is nothing odd or unreasonable about the creditors' actions. In sum, the Court holds that Fedders has failed to allege adequate interference with its property and resulting injuries, thereby warranting a dismissal of its counterclaims under Rule 12(b)(6).[7]

---

**7.** The Court will not consider Fedders' reference to Chrysler's "almost spurious" antitrust claims in the Eastern District of Michigan. First, this allegation goes to the issues of malice and lack of probable cause, which are not part of Chrysler's motion to dismiss. Second, this characterization is belied (or at least significantly undercut) by the Sixth Circuit's review of the district court decision. *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229 (6th Cir. 1981). Moreover, the Court is unimpressed by Fedders' colorful descriptions of Chrysler's behavior. For example, Fedders states that "at oral argument in the District of New Jersey on Fedders' motion for a stay of that action, Judge Ackerman said he was not yet prepared to say that Chrysler's conduct was tantamount to a reincarnation of *Jarndyce v. Jarndyce*—but he did say that, in Lewis Carroll's words, it is curiouser and curiouser." Defendant's Rebuttal Memorandum at 2. A footnote to this sentence, besides promising a transcript when one is available, did admit that the motion to stay was denied, although it hastens to note that the denial was "without prejudice (and [Judge Ackerman] strongly emphasized 'without prejudice')." *Id.* at 2 *.
Upon this Court's reading of the transcript, it appears that Judge Ackerman made no such damning characterization of Chrysler's conduct. Indeed, overall, the hearing included a

lively and convivial discussion of the case, containing many picturesque metaphors and literary allusions. Commenting on the style of Fedders' counsel's presentation, Judge Ackerman said: "I enjoy argument like that because he makes a point which is clearly communicated to the Court. He is rather colorful but ... it makes my job a lot better." Transcript of Proceedings, April 5, 1982, at 31.
The specific references to Charles Dickens and Lewis Carroll were made in Judge Ackerman's response to Chrysler's counsel's complaint about his opposing counsel's oratory. The Judge stated:
> I think *what they are trying to do, rightly or wrongly,* ... is in their words, to try to compare this case to the case of [*Jarndyce v. Jarndyce* in] *Bleak House.* ... [I]f I may carry this literary analogy a bit further, in reading who wants a trial, who doesn't want a trial, who really wants a trial, who is posturing, ... things, in the words of Lewis Carroll are getting curiouser and curiouser.
> I have difficult[y], I must say, Mr. Ehrenbard, in finding out who really wants to go to the post and when.

*Id.* at 47 (emphasis supplied). Read literally and read in the context of the seemingly congenial discussions at the hearing, Judge Ackerman's comments do not bear the one-sided in-

Whereas a claim of malicious prosecution involves the wrongful institution of proceedings which have since ended in the claimant's favor, a claim of abuse of process involves the wrongful use of process, properly issued, in a case which may or may not have terminated. See generally Prosser, Law of Torts, *supra*, §§ 120–21. The starting point for this claim is *Hauser v. Bartow*, 273 N.Y. 370, 374, 7 N.E.2d 268 (1937), where the New York Court of Appeals wrote:

> It is not enough that the actor have an ulterior motive in using the process of the court. It must further appear that he did something in the use of the process outside of the purpose for which it was intended.... Every one has a right to use the machinery of the law, and bad motive does not defeat that right. There must be a further act done outside the use of process—a perversion of the process. If he uses the process of the court for its proper purpose, though there is malice in his heart, there is no abuse of the process. (Citation omitted).

Many cases, in state and federal court, have applied this standard. *See, e.g., State cases: Williams v. Williams, supra*, 298 N.Y. S.2d at 476–77, 246 N.E.2d 333 (allegation that suit was without basis and brought solely to ruin claimant's business reputation set forth cause of action for libel, but not for abuse of process: " 'The gist of the action for abuse of process lies in the improper use of process after it is issued.' ... Process is a 'direction or demand that the person to whom it is directed shall perform or refrain from the doing of some prescribed act.' ... It follows that there must be an unlawful interference with one's person or property under color of process in order that action for abuse of process may lie." (Citations omitted). An omitted footnote reads: "Dean Prosser describes abuse of process as a 'form of extortion' and enumerates the types of writs which can create such a cause of action as follows ...: 'attachment, execution, garnishment, or sequestration proceedings, or arrest of the person, or criminal prosecution, or even such infrequent cases as the use of a subpoena for the collection of a debt.' " (citation omitted)); *Krellman v. Livingston*, 64 App.Div.2d 621, 406 N.Y.S.2d 881, 882 (2d Dep't. 1978) (defendant law firm alleged that plaintiff began his assault and battery action to compel defendant to cease representing a client in another litigation against the plaintiff; held: "That the commencement of the action at this particular time may have been maliciously motivated to achieve some incidental advantage is insufficient to justify allowing the inhibiting effect of a counterclaim for abuse of process.... [T]he mere commencement of a civil action by service of a summons and complaint does not satisfy the requirement that there be regularly issued process which compels the performance or forbearance of a prescribed act."); *Drago v. Buonagurio*, 61 App.Div.2d 282, 402 N.Y.S.2d 250, 252 (3d Dep't. 1978) ("The gist of such a cause of action [for abuse of process] is the improper use of process after it has been issued, and there must be an unlawful interference with one's person or property under color of process.... The summons in the malpractice action against plaintiff was properly issued to institute the action and there is no allegation of improper use of process thereafter."); *Osinoff v. Muchnick*, 53 App.Div.2d 858, 385 N.Y.S.2d 583, 584 (2d Dep't. 1976) (scandalous allegations of fraud in a complaint may be corrected by a motion to strike those allegations; they do not give rise to a cause of action for abuse of process even if the pleader "had a collateral objective (coercing compliance with unreasonable demands)"); *Frank v. Coe*, 51 App.Div.2d 992, 381 N.Y.S.2d 102 (2d Dep't. 1976); *Embassy Sewing Stores, Inc. v. Leumi Financial Corp.*, 39 App. Div.2d 940, 333 N.Y.S.2d 106 (2d Dep't. 1972); *Tender Trap, Inc. v. Town of Huntington*, 100 Misc.2d 108, 418 N.Y.S.2d 537, 541 (Sup.Ct., Suffolk Co. 1979) ("mere indirect injury to a person's business or his good name is not sufficient ... There was no

---

terpretation suggested by Fedders when it states that the references to Dickens and Car-

roll were aimed pointedly at Chrysler's conduct.

arrest in this case, no closing down of the operation, or other interference with property, and consequently, the cause of action for abuse of process is dismissed."). *Federal cases: Alexander v. Unification Church of America*, 634 F.2d 673, 677–78 (2d Cir. 1980) (plaintiff states a cause of action for abuse of process when he alleges that the defendant "procures the initiation of a proceeding by a third party" in order to compel plaintiffs to cease their deprogramming activities); *Dorak v. County of Nassau*, 329 F.Supp. 497, 501–02 (E.D.N.Y.1970), *aff'd.*, 445 F.2d 1023 (2d Cir. 1971) (former prisoner, whose guilty plea was set aside, claimed that he was reprosecuted because of his civil complaint against the county; held: no cause of action because plaintiff "has not been forced to do what was not required of him. Nor has he been forced to give up any rights that he held against the County," thus failing to meet the interference requirement); *Weiss v. Hunna*, 312 F.2d 711, 716–18 (2d Cir. 1963) (plaintiff states a cause of action when he alleges that an attorney brought suits purportedly in the interests of plaintiff's mother's estate, but actually in the interests of the attorney's other clients); *Ann-Margret v. High Soc'y. Magazine, Inc.*, 498 F.Supp. 401, 407–08 (S.D.N.Y.1980) (claims of damage to business reputation, loss of business, and expense of litigation "do not constitute the type of interference with person or property necessary to sustain an abuse of process claim"); *Kalso Systemet, Inc. v. Jacobs*, 474 F.Supp. 666, 670 (S.D.N.Y.1979) ("summons and complaint, which are all that have been filed and 'issued' herein, are not process capable of being abused"; even a vicious or vindictive motive will not make actionable the application of process to its intended use); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 261 F.Supp. 691, 695 (S.D.N.Y.1966) ("no claim lies for the commencement of the action, notwithstanding it may have been maliciously or vindictively motivated").

In 1975, the New York Court of Appeals reviewed the "paucity of New York authority" in this area and concluded that

three essential elements of the tort of abuse of process can be distilled from the preceding history and case law. First, there must be regularly issued process, civil or criminal, compelling the performance or forbearance of some prescribed act. Next, the person activating the process must be moved by a purpose to do harm *without that which has been traditionally described as economic or social excuse or justification.* . . . Lastly, defendant must be seeking some collateral advantage or corresponding detriment to the plaintiff which is *outside the legitimate ends of the process.*

*Board of Education v. Farmingdale Classroom Teachers' Ass'n.*, 38 N.Y.2d 397, 380 N.Y.S.2d 635, 642, 343 N.E.2d 278 (1975) (emphasis supplied). There, the plaintiff was found to have stated a cause of action when it alleged that defendants issued judicial subpoenas duces tecum to 87 teachers, all of whom were to appear on the first day of the proceeding, despite requests to stagger the subpoenas and despite the likelihood that the testimony of so many teachers would not be material or needed.

■ Relying on this holding, Fedders argues that "Chrysler, to start, has issued seven summonses in five jurisdictions," each of which requires a response and threatens a default judgment for failure to respond. Defendant's Memorandum at 36–37. In apparent recognition of the strength of authority against this proposition, Fedders continues: "[A]s a matter of clear decisional law, even the summons alone, used solely to initiate lawsuits—when used excessively, or for an improper purpose, and thus misused—satisfies the first requisite for the tort of abuse of process," citing *Alexander v. Unification Church of America, supra. Id.* at 37. To illustrate its point, Fedders imagines "a plaintiff who with fifty summonses simultaneously initiated fifty identical lawsuits against one defendant in each of the fifty states of this nation." *Id.* at 38. The illegitimate purpose alleged is that Chrysler has attempted to harass and defame Fedders, to impose excessive litigation costs on the defendant, and to coerce Fedders into relinquishing its legitimate con-

tract rights. *Id.* at 40. The first two items in this list are inappropriate claims for damages. *See, e.g., Williams v. Williams, supra* (plaintiff failed to state a cause of action with allegations that "action was totally without basis in fact and was begun solely for the purpose of ruining his business reputation by widespread publication of the complaint," 298 N.Y.S.2d at 476, 246 N.E.2d 333, for failure to allege interference with person or property); *Miller v. Stern*, 262 App.Div. 5, 7–8, 27 N.Y.S.2d 374 (1st Dep't 1941) ("It has repeatedly been held that the mere institution of a civil action which has occasioned a party trouble, inconvenience and expense of defending, will not support an action for abuse of process."). The third item in the list can, in an appropriate case, state a cause of action for abuse of process, but the plaintiff must still be able to show a pretextual use of seemingly proper process which, because of its interference with the claimant, has caused him special, or actual, injury clearly delineated in his complaint.

It is unclear exactly which elements of Fedders' claim are attacked in Chrysler's motion. Regarding malicious prosecution, Chrysler did not challenge Fedders' allegations of malice and lack of probable cause, and the plaintiff did not vigorously argue the issue of a favorable termination. Regarding abuse of process, however, Chrysler's arguments touch on factual issues pertaining to malice. But these factual issues are discussed only in connection with rebutting Fedders' claims that Chrysler has the improper purpose of coercing the defendant. In addition, Chrysler clearly challenges Fedders' failure to allege interference within the meaning of that term in this setting, as well as the insufficiency of its pleadings with regard to special injury.

Fedders argues strenuously that this case should be seen as a collection action by a powerful seller who is harassing a weak purchaser into meeting its installment obligations on a worthless piece of property. Defendant's Memorandum at 1–2. In this connection, it has cited to the Court numerous decisions from unrelated jurisdictions, often involving unrelated theories of law, and, where pertinent on the law, the cases are clear instances of significant interference with the plaintiff's property through the improper use of properly issued process. These cases are either irrelevant or easily distinguishable from the current controversy.[8] More to the point, Fedders has cited the following cases: *Alexander v. Unification Church of America, supra; Avigliano v. Sumitomo Shoji America, Inc.*, 473 F.Supp. 506, 515 (S.D.N.Y.1980), *aff'd. and remanded on other grounds*, 638 F.2d 552 (2d Cir. 1981); *Four Star Stage Lighting, Inc. v. Merrick*, 56 App.Div.2d 767, 392 N.Y. S.2d 297 (1st Dep't. 1977); *Dishaw v. Wadleigh*, 15 App.Div. 205, 44 N.Y.S. 207 (3d Dep't. 1897); *Levine v. Sherman*, 86 Misc.2d 997, 384 N.Y.S.2d 685 (Sup.Ct., Nassau Co. 1976); *500 West 174th Street v. Vasquez*, 67 Misc.2d 993, 325 N.Y.S.2d 256, 257 (Civ.Ct., N.Y.1971); and *Cardy v. Maxwell*, 9 Misc.2d

---

**8.** These authorities are as follows: *Barquis v. Merchants Collection Ass'n*, 7 Cal.3d 94, 101 Cal.Rptr. 745, 496 P.2d 817, 819 (1972) (plaintiffs state claim of abuse of process by alleging "that the collection agency has *wilfully* commenced actions in *improper counties*, with *knowledge* that such counties are improper, and for the improper *ulterior purpose* of impairing its adversaries' ability to defend such suits") (emphasis in original); *Templeton Feed and Grain v. Ralston Purina Co.*, 69 Cal.2d 461, 72 Cal.Rptr. 344, 446 P.2d 152 (1968) (property as to which defendant had no claim seized to force plaintiff to pay debt); *ARC Investment Co. v. Tiffith*, 164 Cal.App.2d Supp. 853, 330 P.2d 305 (Cal.Super.Ct., App. Dep't. 1958) (repeated garnishments and levies against workman's wages exempt for support of family); *Aztec Sound Corp. v. Western States Leasing*

Co., 32 Colo.App. 248, 510 P.2d 897 (1973) (After two writs of replevin, plaintiff met defendant's demands "after it became obvious that execution of the writ would completely halt plaintiff's business operation."); *Duty v. General Fin. Co.*, 154 Tex. 16, 273 S.W.2d 64 (1954) (plaintiff stated a cause of action for intentional infliction of emotional distress without actual physical injuries); *LaSalle Extension Univ. v. Fogarty*, 126 Neb. 457, 253 N.W. 424 (1934) (LaSalle sent about forty letters to Fogarty, his neighbors and his employer making threats, accusations, and derogatory remarks; Fogarty stated a cause of action for intentional infliction of emotional distress); *Tuyes v. Chambers*, 144 La. 723, 81 So. 265 (1919) (libel); *Hutchins v. Page*, 75 N.H. 215, 72 A. 689 (1909) (libel).

329, 169 N.Y.S.2d 547 (Sup.Ct., N.Y.Co. 1957). These cases, however, show that Fedders has not met the narrowly drawn requirements needed to state a claim for abuse of process, which remedies wrongful achievement of "collateral advantage, whether it be denominated extortion, blackmail or retribution." *Board of Education v. Farmingdale Classroom Teachers' Ass'n, supra*, 380 N.Y.S.2d at 643, 343 N.E.2d 278. This case does not warrant a departure from the "public policy mandat[ing] free access to the courts for redress of wrongs ... [in an] adversarial system [that] cannot function without zealous advocacy." *Id.*

The decisions in *Alexander* and *Dishaw v. Wadleigh, supra*, should be considered together because the former relies squarely on the latter. In *Dishaw v. Wadleigh*, the defendant was an attorney who would assign his clients' claims to an accomplice in a distant town, and the accomplice, who received a small fee and who paid nothing for the assignments, would start proceedings there with the hope that the defendants would fail to appear and thereby default, or at least that the defendants would confess judgment. When asked by the court whether the intention was that the debtors would "rather pay than come over to [the distant town]," the witness responded: "That, as I understand it, is the gist of it." 44 N.Y.S. at 207. In addition, the plaintiff clearly alleged an interference with his person in that the defendant swore out an arrest warrant against him, pursuant to which he was arrested and caused to appear in court. In its revulsion, the court wrote: "The facts here disclose a disreputable method of practice, degrading to an honorable profession, and well calculated to bring the administration of justice into reproach and contempt." *Id.* at 208.

Relying upon this precedent, the Second Circuit Court of Appeals held that the plaintiff in *Alexander* stated a claim for abuse of process when he alleged that the defendant, to harass and cow the plaintiff, sought out third parties (members of the church) to initiate lawsuits against deprogrammers, that the third parties could not have afforded to bring suits on their own, and that any compensation received as a result of these suits would enure to the church's benefit. This case involves nothing even remotely resembling the artifice or subterfuge alleged in *Alexander* and *Dishaw v. Wadleigh*, where third parties were used to achieve results outside the permissible use of process. There is no suggestion, anywhere in the record, that Chrysler is acting for any interests other than its own, and Fedders misreads the precedents just discussed when it states that the *Alexander* decision upheld a claim of abuse of process "on account of defendant's mere initiation of prior lawsuits," Defendant's Memorandum at 37, and when it states that *Alexander* involved "*less* abusive and coercive conduct than that present here," Defendant's Rebuttal Memorandum at 4–5 (emphasis in original).

The other cases cited are also distinguishable. In *Four Star Stage Lighting, Inc. v. Merrick, supra*, the plaintiffs alleged that "defendants used the order of seizure in order to force plaintiffs into buying defendant Merrick's equipment at an unreasonable price." 392 N.Y.S.2d at 298. This clearly alleges an interference with plaintiffs' property for a purpose outside the range of permissible objectives in the use of process. In *500 West 174th Street v. Vasquez, supra*, the court found that "[the landlord-defendant] commenced five nonpayment proceedings and pursued none of them. They appeared on the trial calendar ten times in all. With possibly one exception, Vasquez was always present. With one exception, the landlord was never present." 325 N.Y.S.2d at 259. Under those circumstances, the court ruled that the repeated issuance of process, coupled with the failure to appear, was a perversion of process and evidenced an intention to harass the tenant who sought to have the landlord make repairs allegedly required by state statute. In *Levine v. Sherman, supra*, one defendant of three made a motion to dismiss a claim of abuse of process (at a very early stage of litigation) on the grounds that he had only limited involvement in the transactions, not that plaintiff failed adequately to allege a

perversion of process. The court denied the motion because the moving party had admitted at least some involvement. Regarding the alleged abuse of process, the court commented (apparently on its own initiative) that "[t]he history of [litigation between the parties] is consistent with harassment," pointing out that the defendants had filed three actions in the same court seeking the same relief. The second action had been dismissed on the merits because of the pendency of the first action, and the third action, filed after the dismissal on the merits of the first, was also dismissed on the merits. The identity of the actions filed, the repeated dismissals on the merits, the early stage of the motion, and the limited basis of the motion, all distinguish *Levine v. Sherman* from this suit.

In *Cardy v. Maxwell, supra,* the plaintiff made specific allegations that the defendants threatened to give their complaint "extensive and lurid publicity" through newspaper advertising if the plaintiff did not meet their demands and that defendants carried out their threats when plaintiff refused. While noting that the mere institution of a lawsuit will not give rise to an action for abuse of process, the court found that judicial process had become "an instrument of attempted blackmail and extortion." 169 N.Y.S.2d at 549–50. The allegations in that suit were much more specific and the challenged conduct much more outrageous than anything alleged by Fedders, which only points to the fact that multiple suits were filed and alleges generally that Chrysler has tried "to coerce Fedders into abandoning its rights" by protracting and expanding its litigation fronts and that Chrysler has done so "to harass and defame" Fedders and to interfere with its business. Amended Answer ¶¶ 21, 24. In addition, this Court would hesitate to follow the lead of *Cardy v. Maxwell* for two reasons. First, it is unclear what strength *Cardy v. Maxwell* carries after *Williams v. Williams, supra,* where the Court of Appeals rejected an abuse of process claim which alleged that the prior litigation "was begun solely for the purpose of ruining his business reputation by widespread publica-

tion of the complaint." 298 N.Y.S.2d at 476, 246 N.E.2d 333. If *Cardy v. Maxwell* retains a place in this area of New York law, it must be because the allegations there, unlike Fedders', amounted to a claim of blackmail or extortion. Second, the *Cardy v. Maxwell* court failed to consider the lack of an actionable interference, another element of the cause of action discussed in *Williams v. Williams, supra.* 298 N.Y.S.2d at 476–77 & n.1.

This Court's opinion in *Avigliano v. Sumitomo Shoji America, Inc., supra,* is similarly distinguishable. There, the defendant alleged

> that plaintiffs' purpose in bringing proceedings before administrative and judicial tribunals has been to coerce Sumitomo into acceding to their demands for work assignments for which they were unqualified and for payment of additional compensation to which they were not entitled.

473 F.Supp. at 515. In light of these allegations, as well as other facts discussed in the opinion, it is clear that the defendant alleged with specificity a pattern of coercive conduct accompanied by the institution of sham proceedings for the purpose of harassing and intimidating the defendant into compliance. Fedders has made no such particularized claims and no such claims that Chrysler is pursuing sham litigation for an ulterior purpose.

In conclusion, Fedders has presented no persuasive reason why Chrysler's litigation strategy should be viewed as outside the realm of the permissible assertion of rights. Fedders argues at various points that Chrysler itself had stated that this litigation ordinarily would have been pursued in a single action. The parties' relations, however, have not been ordinary. The Court is satisfied by Chrysler's counsel's representations that each of the lawsuits was filed and pursued for at least facially appropriate reasons. See Ehrenbard Aff. Short of some specific allegations about coercion, out of the ordinary course of litigation, the Court refuses to countenance Fedders' counterclaims. Fedders has failed to allege

that Chrysler's claims are a sham, *Alexander v. Unification Church of America, supra; Avigliano v. Sumitomo Shoji America, Inc., supra*; has failed to allege an interference with the corporation's business through the misuse of process, *Williams v. Williams, supra; Drago v. Buonagurio, supra; Kalso Systemet, Inc. v. Jacobs, supra*;[9] has failed to allege any misuse of process equivalent to such an interference, *Board of Education v. Farmingdale Classroom Teachers' Ass'n., supra*; and has failed to allege special damages with the requisite particularity, *Lincoln First Bank of Rochester v. Siegel, supra.*

Essentially, Fedders' claims rest upon the filing of multiple actions, a theory which has been specifically rejected by at least one New York court, *Piranesi Imports, Inc. v. Laverne*, 36 Misc.2d 1077, 233 N.Y.S.2d 659 (Sup.Ct., N.Y.Co.1962), and one federal court, applying New York law, dismissed several defendants' counterclaims of abuse of process which rested upon the filing of two actions by the plaintiff, with an allegation that other actions would likely follow. The court ruled that "no claim lies for the commencement of [an] action, notwithstanding it may have been maliciously or vindictively motivated." *Rosemont Enterprises, Inc. v. Random House, Inc.*, 261 F.Supp. 691, 695 (S.D.N.Y.1966). While the tort of abuse of process is difficult to make out in the ordinary case, a claim based upon multiple actions is even more difficult to state because it rests upon summonses and complaints, which have been called "not process capable of being abused," *Ann-Margret v. High Soc'y. Magazine, Inc., supra*, 498 F.Supp. at 407; *Kalso Systemet, Inc. v. Jacobs, supra*, 474 F.Supp. at 670 (interpreting *Williams v. Williams, supra*). If Fedders' worst-case suggestion of fifty identical complaints simultaneously filed in fifty jurisdictions ever came to pass, this Court is confident that the courts involved would countenance a claim of abuse of process or some other appropriate relief. But where Chrysler has strenuously attempted to assert its rights under a multi-million dollar contract and, in its frustration, has filed various lawsuits on various theories to secure various rights, Fedders cannot base its claim of abuse of process simply on the multiplicity of suits. Accordingly, the counterclaim for abuse of process is dismissed on the merits.

**9.** In the section of its memorandum dealing with "Chrysler's Use of 'Process,'" Fedders relies solely on Chrysler's issuance of multiple summonses and complaints as the basis for its abuse of process claim, Defendant's Memorandum at 36–39, but in a footnote at the end of its discussion, Fedders notes that Chrysler has imposed lis pendens on its property in Kentucky and New Jersey, *id.* at 39 *. According to the defendant, the "Third Circuit Court of Appeals has explicitly ruled that Chrysler's use of the *lis pendens* can give rise to a cause of action for abuse of process," *id.*

The mere fact, however, that Chrysler has filed lis pendens does not satisfy the requirement of an interference with property. Fedders has failed to allege any misuse or perversion of process *after* its issuance. Presumably, if Chrysler had used the lis pendens for some purpose other than its intended one, Fedders would have made allegations to that effect; no such allegations have been made in the amended answer or in the defendant's memorandum. In addition, the case law of Kentucky and New Jersey, where the lis pendens were filed, is not favorable to Fedders. A Kentucky appellate court has ruled that a lis pendens is not "process" and therefore cannot give rise to a claim of abuse of process. *Bonnie Braes Farms, Inc. v. Robinson*, 598 S.W.2d 765 (Ky.Ct.App.1980). And in New Jersey, no state court has directly decided this issue, although the Third Circuit (interpreting New Jersey law) "note[d] that the remedies of malicious prosecution and abuse of process are *likely* to be available ... to provide *some* protection against *improper* utilization of lis pendens." *Chrysler Corp. v. Fedders Corp.*, 670 F.2d 1316, at 1330 (3d Cir. 1982) (emphasis supplied). This statement is couched in cautious terms and it incorporates the requirement of "improper" use of process. Furthermore, the Third Circuit cited a less drastic form of relief under the New Jersey statute, which permits the discharge of a lis pendens if the plaintiff fails to prosecute its claim diligently or for other good cause shown. Similarly, a successful motion to dismiss or for summary judgment would discharge the lis pendens. Fedders has not made a successful motion on the merits, nor sought discharge under the statute, nor alleged "improper" use of the lis pendens. For all of these reasons, the Court finds that Fedders' reference to Chrysler's filing of lis pendens does not cure its failure to allege adequate interference with property.

## MOTION FOR AN EXPEDITED TRIAL

■ Simultaneous with Chrysler's motion to strike the recently asserted counterclaims, Fedders has moved for an expedited trial under Fed.R.Civ.P. 40 and Local Rule 9 for the Division of Business Among District Judges. The supporting affidavit is rife with righteous indignation and heavy with hyperbole, often taking the form of military metaphors. Affidavit of Arthur L. Liman, sworn to Feb. 11, 1982 ("Liman Aff."). A few illustrations will suffice:

2. Fedders makes this motion to put an end to one of the more scandalous instances of litigation abuse since *Jarndyce v. Jarndyce* (High Ct. Chancery 1853). [Twenty-eight line footnote, quoting two paragraphs from Dickens' *Bleak House*, has been omitted.]

\* \* \* \* \* \*

5. ... Chrysler has, in short, conducted a four year campaign of litigation equivalent to a scorched-earth policy.

\* \* \* \* \* \*

8. ... The only effective way to rid the courts (and Fedders) of this blight of Chrysler lawsuits is to compel Chrysler to go to trial.

\* \* \* \* \* \*

24. ... If [Chrysler's] kind of discovery becomes the standard for "most commercial disputes," the federal courts might as well close their doors to all other litigants, civil and criminal. [Omitted footnote states, in part: "[T]he disease of discovery abuse, once contracted, becomes not only virulent but also contagious. And so, Fedders having been closeted with the carrier of the germ for so long, in one instance also manifested some symptoms of Chrysler's 'depositionitis,' by examining one witness for twenty-odd sessions (albeit without objection from Chrysler)."]

\* \* \* \* \* \*

30. ... These kinds of [litigation] expenses may be a drop in the bucket to a federally-subsidized giant like Chrysler, but they cannot be borne easily by a company one-hundredth Chrysler's size, Fedders.

\* \* \* \* \* \*

32. ... Chrysler has succeeded, by its proliferation of actions elsewhere, in turning this dispute into a judicial Vietnam. Chrysler's tactics are almost a paradigm of how a modern litigant can wage unlimited guerilla war.

\* \* \* \* \* \*

34. ... In the interest not only of Fedders, but also in the interest of reducing the burdens Chrysler has imposed on the nation's judicial system as a whole, we respectfully urge the Court to set an early and firm trial date.

In response to these characterizations and to Fedders' rendition of the factual history of this case, Chrysler's counsel submitted a 41-page affidavit, the opening paragraphs of which state, in part, as follows:

At the outset, I should note that Chrysler has no objection to an early trial of any actual issues of fact in dispute in this case and indeed, seeks such a trial [after appropriate completion of pretrial practice and narrowing of issues]. . . .

In view of [Fedders' counsel's] numerous remote misstatements, most of my affidavit will be devoted to responding to the allegations contained in [it].

Affidavit of Robert Ehrenbard, sworn to March 5, 1982, at 1–2. Essentially, Chrysler's counsel defends his client's litigation strategy and urges the Court to view Fedders' request for an expedited trial as a sudden reversal of its prior dilatory tactics.

The Court finds very unfortunate this open display of acrimony between competent lawyers, but such matters have almost no bearing on Fedders' request for a prompt trial. It is clear that Local Rule 9 is inapplicable to this case because it speaks of an immediate screening of newly-filed cases by the Assignment Committee which may determine that a particular case requires "a prompt trial or other disposition within sixty (60) days." Nonetheless, Fedders would have the Court view this case as one of those which, in the language of the Rule,

"because of exceptional and special circumstances, demand extraordinary priority, prompt disposition, and immediate judicial supervision in the public interest." Liman Aff. ¶ 1. The Court, however, finds nothing extraordinary about this case, except perhaps the vehement vituperation of counsel. And Fedders' counsel appears to admit as much:

> 17. Although each party has asserted a number of additional claims, it is obvious this case essentially presents issues of contractual compliance; who owes what to whom. There are only two real parties to the dispute. Only a discrete set of transactions over a limited period of time is involved. No complex theories of law or science are involved. Chrysler has asserted the "issues are no more complex than most commercial disputes which are brought in the federal district courts." . . . [footnote omitted]

Liman Aff. ¶ 17. In essence, the Court agrees with this characterization, which indicates that this is not an exceptional case—it is a matter of "who owes what to whom"—and it is surely not deserving of any special preference on the Court's trial calendar. The Court notes, however, that it does not anticipate any substantial delay in scheduling a trial once pretrial practice has been completed.

So ordered.