**SFM CORPORATION, Plaintiff,**

v.

**SUNDSTRAND CORPORATION, Defendant.**

**No. 82 C 4933.**

United States District Court, N.D. Illinois, E.D.

Sept. 2, 1983.

Byron L. Gregory and Roger W. Wenthe, McDermott, Will & Emery, Chicago, Ill., for plaintiff.

Joseph R. Lundy and Robin L. Greenwald, Schiff, Hardin & Waite, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

SFM Corporation ("SFM") brought this diversity action charging a refusal by Sundstrand Corporation ("Sundstrand") to perform its contract to buy complex machine tools manufactured by SFM. In turn Sundstrand initially filed a one-count Counterclaim accusing SFM of breach of contract. Some nine months later Sundstrand filed a greatly expanded four-count Amended Counterclaim. SFM now moves to strike Amended Counterclaim Counts II through IV ("Counts II–IV"). For the reasons stated in this memorandum opinion and order, SFM's motion is conditionally denied.

### Background[1]

Early in 1979 Sundstrand solicited a quotation from SFM for machines capable of making metal shafts for hydrostatic transmission controls produced by Sundstrand. In April 1979 SFM furnished a quotation for two machines. During the next 14 months SFM and Sundstrand conducted extensive negotiations, much of which centered on the performance standards to which the machines would be expected to conform. In July 1980 SFM submitted a revised quotation reflecting the results of those negotiations. In October 1980 Sundstrand issued a purchase order for two

---

1. In all material respects this section reflects undisputed facts.

lathes, a centering machine and accessory equipment (collectively the "Lathes"), setting the purchase price at $830,684 and calling for delivery by January 31, 1982. Later the parties agreed on various written and oral revisions of the original purchase order (for convenience this opinion calls the purchase order as so modified the "Contract"). One such modification extended the delivery target date to May 28, 1982, prompted at least in part by SFM's inability to complete the manufacture and testing of the Lathes due to a strike by its work force from May through July 1981.

Throughout the first half of 1982 SFM was continually beset by production difficulties (the cause of which is hotly contested by the parties). Consequently it was unable to complete the Lathes by May 28. Next day Sundstrand sent SFM a telex unilaterally cancelling the Contract. Sundstrand cited as the basis for its action SFM's failure to complete a successful "runoff" of the Lathes and to meet the extended delivery deadline.

On August 10, 1982 SFM filed this lawsuit, seeking compensatory damages of $830,684 for breach of contract and $1 million for fraud and estoppel, plus punitive damages of $3 million for fraud and estoppel. On September 28 Sundstrand filed its Answer and Counterclaim, the latter charging SFM with breach of contract and seeking compensatory damages of $190,000 (the estimated costs attributable to (1) Sundstrand's efforts to cover and (2) Sundstrand's inability to procure substitute Lathes for a significant period of time since the May 28, 1982 delivery date).

Discovery proceeded at a brisk pace during the nine months that preceded Sundstrand's May 25, 1983 motion for leave to file the Amended Counterclaim. By that date SFM had taken the depositions of 11 current and former Sundstrand employees, totaling 15 full days of testimony and 2,601 pages of transcript. During that same period Sundstrand deposed one former Sundstrand employee and six current and former SFM employees, consuming 18 full days of testimony and 2,326 pages of transcript.

Because discovery was nearing completion, on May 17, 1983 (just eight days before the Amended Counterclaim was filed) Magistrate Olga Jurco scheduled a June 27 status hearing to set the date for the final pretrial order. At a status hearing before Judge Flaum that same day (May 17), the parties discussed possible discovery cutoff dates. SFM's counsel indicated discovery would be completed within six weeks, while Sundstrand's counsel estimated an additional 60–90 days would be required. Judge Flaum declined to set a date for close of discovery because of his appointment to our Court of Appeals, preferring instead to leave such scheduling to the judge to whom the case would be reassigned.

On May 25 Sundstrand requested leave to file its Amended Counterclaim, which contained three wholly new Counts:

1. Count I is identical to the original one-count Counterclaim except that the claimed damages have been raised to $481,826.20.

2. Count II alleges SFM fraudulently misrepresented and omitted material facts to manipulate Sundstrand into entering a contractual arrangement to purchase the Lathes. Count II ¶ 16 identifies three such misrepresentations:

(a) SFM's Model 400 Tracer Lathe, which SFM proposed to sell to Sundstrand, was a standard lathe as described in the sales literature provided by SFM to Sundstrand and expressly incorporated into the Contract.

(b) The lathes were capable of holding diametrical and concentricity tolerances of .002 inch on the block spline diameter of Sundstrand's shaft 3101867 and similar shafts.

(c) The lathes were capable of holding linear and other tolerances of plus or minus .002 inch on the parts turned on the Lathes.

Count II ¶ 17 lists five assertedly fraudulent omissions:

(a) Before accepting the Contract SFM had never designed or built a Model 400 bar feed tracer lathe that it knew to be capable of holding linear

and other tolerances of plus or minus .002 inch.

(b) Before accepting the Contract SFM had designed and built Model 400 bar feed tracer lathes for only one customer. Those lathes had not been required to hold linear tolerances of plus or minus .002 inch.

(c) Before accepting the Contract SFM Vice-President Ebel had never consulted with SFM engineering personnel, or with SFM sales personnel with experience in engineering, as to the requirements of the Contract.

(d) SFM engineering personnel, and SFM sales personnel with engineering experience, doubted the capability of an SFM Model 400 bar feed tracer lathe of the type SFM proposed to build for Sundstrand to hold linear tolerances of plus or minus .002 inch.

(e) Although SFM had guaranteed Sundstrand in writing that the SFM machines could hold certain tolerances or achieve other performance specifications "on a production basis," SFM did not intend those guaranties to apply to "production runoffs" of the machines that were expressly provided for in the Contract as a means for Sundstrand to determine whether or not to accept the machines.

3. Count III says SFM breached its contractual duty to deal in good faith by making material misrepresentations and omissions during the course of its attempted performance under the Contract. Count III ¶ 26 states two such misrepresentations:

(a) Despite a strike at SFM in the summer of 1981, SFM could complete work on the Lathes in time to deliver them to Sundstrand by the original delivery date in the Contract of January 31, 1982.

(b) At various times during the spring of 1982 the Lathes were producing shafts in accordance with the requirements of the Contract during quality runs conducted by SFM.

Count III ¶ 27 cites two such omissions:

(a) SFM believed a tooling concept adopted by SFM after discussions with Sundstrand, the design for which was thereafter approved by Sundstrand, was not adequate to permit the Lathes to produce shafts for Sundstrand in accordance with the requirements of the Contract.

(b) If the Lathes proved incapable at a customer runoff of producing shafts in accordance with the requirements of the Contract, SFM intended to seek from Sundstrand a "deviation" from the Contract by which SFM could seek to persuade Sundstrand to accept Lathes that were not capable of producing parts to the tolerances expressly called for in the original Contract.

4. Count IV asserts Sundstrand relied detrimentally on the misrepresentations and omissions described in Count III—by failing to cancel the Contract before it suffered any significant losses from SFM's failure to perform.

Judge Flaum granted Sundstrand's motion without prejudice to SFM's right to move to strike Counts II–IV. SFM then filed a Reply to Count I, but moved to strike Counts II–IV.

*Motion To Strike*

■ Two separate but related provisions, Fed.R.Civ.P. ("Rules") 13(f) and 15(a), govern the propriety of filing belated counterclaims:

1. Rule 13(f) deals exclusively with omitted counterclaims, allowing such claims to be added "by amendment" when their earlier omission resulted from "oversight, inadvertence, or excusable neglect, or when justice requires."

2. Rule 15(a), which mandates that leave be "freely given" to amendments of any pleading, expresses only the "when justice so requires" standard.

Despite the variation in their wording, Rules 13(f) and 15(a) have been construed as prescribing essentially the same standards for granting leave to add omitted counterclaims. See *Chrysler Corp. v. Fedders Corp.*, 540 F.Supp. 706, 714–15 (S.D.N.

Y.1982); 6 Wright & Miller *Federal Practice and Procedure* § 1430, at 158–59.

As *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) teaches, the liberal amendment policy of Rule 15(a) (and presumably Rule 13(f) as well, 6 Wright & Miller § 1430, at 159) may give way in certain circumstances:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

SFM contends three of those exceptions justify striking the three new counts of the Amended Counterclaim:

> 1. Addition of the omitted counterclaims after completion of substantial discovery amounts to "undue delay" because Sundstrand had sufficient knowledge of the factual basis for those claims before it filed its Answer and original Counterclaim.
>
> 2. Sundstrand's tardy Amended Counterclaim was spurred by its "bad faith" desire to protract this action.
>
> 3. Counts II–IV fail to state a claim and thus should be stricken because of the "futility of amendment."

Though the first argument has some merit and requires analysis, the second and third are untenable and will be dispatched at the outset.

Even were Sundstrand's proposed amendment untimely, on the present record there is no evidentiary basis for imputing bad faith to Sundstrand. At worst it appears Sundstrand was delinquent in not having jelled its thinking on the added theories of recovery when (or soon after) it filed the original Counterclaim. Nor does Sundstrand's resistance to some of SFM's dis-

covery-requests require a bad faith finding original Counterclaim. Nor does Sundstrand's resistance to some of SFM's discovery requests require a bad faith finding as to Sundstrand's motivations in filing the Amended Counterclaim. At worst Sundstrand might be perceived as engaged in the all-too-common footdragging that mars federal discovery practice,[2] but even if that were so the barring of its counterclaim would represent overkill.

■ SFM's third contention cannot prevail at this threshold pleading stage. This Court cannot now conclude the fraudulent representations and omissions ascribed to SFM by Counts II–IV are non-actionable as a matter of law. Generally, to constitute fraud a misrepresentation must concern a past or existing material fact. As a corollary, expressions of opinion and promises or predictions of future fact ordinarily cannot ground fraud charges. See 19 I.L.P. Fraud §§ 8, 9, at 560–66. But that general proposition is limited by several exceptions, one of which may well be applicable here (depending on the underlying circumstances): Any prediction of future events (or statement of intention) or opinion may be deemed fraudulent if the person making the representation has or professes to have superior knowledge. *Id.* at 563, 566. Thus even were the asserted misrepresentations and omissions attacked in Counts II–IV characterized as opinions or predictions (an issue that itself may raise factual questions, *id.* at 561), those allegations are legally sufficient to support a claim of fraud.[3]

There remains for consideration SFM's claim of "undue delay." SFM has mustered considerable logical and evidentiary support for its contention Sundstrand was aware of the fraudulent nature of the Counts II–IV misrepresentations and omissions[4] before the Contract was cancelled May 28, 1982 (four months before the original Counterclaim was filed):

---

**2.** This is *not* a finding by this Court, but rather an arguendo assumption to show denial of leave to file would not be appropriate anyway.

**3.** In any event, Count III is a breach of contract claim (based on SFM's duty to deal in good

faith) and hence is not subject to any of those limitations on common law fraud claims.

**4.** For purposes of the text discussion it will be assumed Sundstrand's version of the facts is correct.

1. Count II ¶ 16(a), (b) and (c): Sundstrand became cognizant of the falsity of those affirmative misrepresentations, which concerned the Lathes' tolerance capabilities and non-standard nature, when its sales and engineering personnel observed those machines in operation during two test runs in March and May 1982 (SFM Exs. 12, 13).

2. Count II ¶ 17(a) and (b): In view of its pre-May 28 awareness of SFM's inability to construct Lathes with the requisite tolerance capabilities, Sundstrand had reason to know of SFM's lack of experience in building such machines.

3. Count II ¶ 17(c): Sundstrand employees believed as early as March 1, 1982 SFM was giving insufficient "engineering commitment" to the Lathes project (SFM Ex. 14). That evidence suggests Sundstrand's possible pre-May 28 awareness of SFM's asserted failure to consult with engineering personnel before accepting the Contract.

4. Count II ¶ 17(d): According to a Sundstrand quality control manager's report on the March 1982 runoff, several SFM employees expressed doubts as to whether the Lathes could generate the desired tolerance (SFM Ex. 15 at 4).

5. Count II ¶ 17(e): By the May 1982 demonstration, Sundstrand was obviously aware of the different interpretation given to the phrase "production runoffs" by SFM personnel (SFM Ex. 16, Minutes at 1–2).

6. Count III ¶ 26(a): As early as February 1, 1982 Sundstrand necessarily knew SFM's prediction of meeting the original January 31, 1982 delivery date (despite the strike) had not been borne out.

7. Count III ¶ 26(b): Sundstrand officials had inspected the shafts produced by the Lathes in the spring of 1982 and realized those shafts did not comport with the Contract's requirements (SFM Exs. 17, 18).

8. Count III ¶ 27(a) and (b): In a series of meetings in mid-April 1982 with three Sundstrand representatives, SFM officials expressed their dissatisfaction with Sundstrand's tooling concept and formally requested deviations in several of the tolerance specifications (SFM Ex. 16; Minutes at 5).

Sundstrand does not even attempt to rebut SFM's point-by-point analysis with its own evidentiary showing. Instead it baldly disclaims any awareness before discovery began of two critical elements of the charges of fraud (and bad faith) in Counts II–IV:

1. SFM's alleged misrepresentations and omissions were false or deceptive.

2. SFM made those misrepresentations and omissions with knowledge of their falsity or deceptiveness.

Those wholly conclusory responses are really inadequate.

First of all, Rules 13(f) and 15(a) place the burden of proof squarely on Sundstrand, not SFM. Sundstrand failed to meet that burden by neglecting not only to substantiate its asserted pre-discovery ignorance of those two elements of a fraud claim but also to identify the discovery materials that provided the missing informational links. Moreover, even were the burden of proof shifted to SFM this Court would still find Sundstrand had sufficient knowledge to plead Counts II–IV when the original Counterclaim was filed:

1. SFM's evidentiary showing convincingly demonstrates Sundstrand learned of the falsity or deceptiveness of SFM's alleged misrepresentations and omissions (with the possible exception of the omission described by Count II ¶ 17(c)) before the Contract was even cancelled.

2. Sundstrand's supposed unawareness that SFM officials made those misrepresentations and omissions with knowledge of their falsity is irrelevant, for that is not the only species of culpable intent on which liability for false representations may be predicated. Scienter also exists when the "representations which are in fact false are made in reckless disregard of whether they are true or false." 19 I.L.P. Fraud § 10, at 568.

Surely Sundstrand had enough "knowledge, information and belief" SFM representatives acted with such culpable ignorance, especially in view of the inherently reckless nature of at least some of SFM's alleged misrepresentations and omissions and SFM's superior knowledge of their subject matter. And given the difficulty of securing evidence of defendants' state of mind before suit is brought, Sundstrand was plainly confronted with no Rule 11 problem had it filed a fraud-based counterclaim.

Accordingly, the Amended Counterclaim has been tendered belatedly.

But that finding is not necessarily fatal to Counts II–IV, for *Foman*'s concept of "*undue* delay" requires a weighing of the prejudice to both sides. *Chrysler Corp.*, 540 F.Supp. at 717; 3 Moore's Federal Practice ¶ 15.08[4], at 15–85 to 15–86. Were this Court limited to the choice of unconditionally allowing or disallowing Counts II–IV, the scales would not tip decisively in either direction:

1. Because of their "compulsory" nature under Rule 13(a), barring Counts II–IV now would preclude Sundstrand from ever asserting those counterclaims—at least in a subsequent federal action. See Wright & Miller § 1430, at 157–58. Contrary to SFM's assertion, the mere fact Counts II–IV only present different legal theories for the same relief sought in Count I does not lessen the prejudice visited upon Sundstrand by the exclusion of those proposed counterclaims.

2. On the other hand, permitting Counts II–IV to stand could pose two adverse consequences to SFM. It would likely be forced to incur substantial expenses to redepose those witnesses knowledgeable about the matters asserted in those counterclaims. And its ability to bring its own claim to a prompt resolution could be seriously impaired.[5]

But this Court is not constrained by an all-or-nothing choice. Certainly the "when justice requires" language of Rules 13(f) and 15(a) endows this Court with the discretionary power to condition the filing of an *untimely* amendment on terms that are just. *Cf.* 6 Wright & Miller § 1430, at 155 (noting "flexibility" of that phrase). Here "justice requires" that retention of Counts II–IV be contingent on Sundstrand's willingness to reimburse SFM for its incremental expenses of reexamining (by deposition or interrogatories) previously deposed witnesses on issues raised by Counts II–IV:[6]

1. Such a minimal and moderate requirement would give effect to the liberal amendment policy of Rules 15(a) and 13(f), while at the same time mitigating the prejudice SFM would otherwise suffer as a result of Sundstrand's delinquency.

2. SFM's other assertedly incurable forms of prejudice are too speculative to justify banishing Counts II–IV from this lawsuit:

(a) any deterioration in the witnesses' ability to recall the relevant events [7] and

(b) any heightened hostility of adverse witnesses inconvenienced for the second time.

Indeed, those potential witness problems could cut either way. After all it is Sundstrand that bears the burden of proving its own counterclaims.

Finally this Court will block any prospect of prejudice to SFM that might be caused by delaying its right to trial. For priority

---

5. It is true SFM overstates the case by referring to this action as "on the eve of trial" (Mem. 10).

6. Those incremental expenses include (but are not necessarily limited to) subpoena fees, mileage and attendance fees, attorneys' fees, court reporters' fees and travel and lodging expenses. Determination of the incremental amounts should be made on a "but-for" basis.

7. Because a significant time period had elapsed before the first depositions of those witnesses were taken, it remains to be seen whether their powers of recollection diminished appreciably during the next nine months. If that were to turn out to be the case, consideration may be given to any available and appropriate measures at that time.

purposes vis-a-vis other cases on this Court's calendar, discovery in this action will be treated as having been closed August 15,[8] with September 30 the putative pretrial conference date to consider the final pretrial order that would presumably have resulted. That will put SFM in precisely the same position it would have occupied on the ladder of cases awaiting trial as if the Amended Counterclaim had never been filed.

### Conclusion

SFM's motion to strike will be denied, on the condition Sundstrand acknowledges its obligation to indemnify SFM for the incremental costs of any duplicative discovery. Sundstrand shall provide written confirmation of that acknowledgement on or before September 8, 1983.

---

**8.** That date gives Sundstrand the benefit of its own counsel's outside estimate for completion of discovery remaining at the time of Judge Flaum's May 17 status call.